**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Chaim BABAD, Bernard Steinmetz and Emanuel Steinmetz, a Co-Partnership d/b/a J.R.R. Realty Co., Respondents.**

**No. 119, Docket 85–4068.**

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1985.

Decided March 4, 1986.

Morris Tuchman, New York City, for respondents.

Jesse Gill, N.L.R.B., Washington, D.C. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, W. Christian Schumann, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Ira A. Sturm, Manning, Raab, Dealy & Sturm, New York City, for intervenor Local 32B–32J, Service Employees Intern. Union, AFL–CIO.

Before LUMBARD, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

The National Labor Relations Board (NLRB or Board) found that respondent J.R.R. Realty Co. (J.R.R.) had violated subsections 8(a)(1), (3) and (5) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(1), (3) and (5) (1982). The Board seeks enforcement of a remedial order requiring J.R.R. to cease and desist from the unfair labor practices, to recognize and bargain with intervenor, Local 32B–32J, Service Employees International Union, AFL–CIO (union), and to offer reinstatement and back pay to the discharged employees.

The petition to enforce the order is granted.

## BACKGROUND

This labor dispute concerns events that took place in 1980 and 1981 at an apartment building in Queens, New York. The building was owned by JARU Properties, Inc. and ASCR Realty, Inc. (JARU and ASCR) and was managed by J.A.R. Management Corp. (J.A.R.). J.A.R. employed six members of Local 32B–32J to

run the building. The collective bargaining agreement between J.A.R. and the union contained a provision which stated that if J.A.R. sold the apartment building, it would require the purchaser to agree in writing to adopt the agreement and to offer employment to all of the employees.

In November 1980, JARU and ASCR entered into a contract to sell the apartment building to Joshua Estates, Inc., a nominee corporation for J.R.R. Realty.[1] The sale contract provided that the purchaser would take title "subject to" a variety of specified permitted encumbrances. The collective bargaining agreement with the union was specifically listed as one of the permitted encumbrances and a copy of the agreement was attached to the sale contract. J.App. at 179.

On March 31, 1981, at the title closing, attorney Harry Newman, on behalf of Joshua Estates, and Chaim Babad, on behalf of J.R.R. Realty, executed an assignment of the sale contract to J.R.R. Realty. At the same time, the former owners and J.A.R. specifically assigned the collective bargaining agreement between J.A.R. and the union to J.R.R. Realty. Finally, Joshua Estates and J.R.R. executed an indemnity agreement in which they agreed that title to the building was subject to all obligations of the sellers under the leases, contracts and agreements in effect on the closing date and to hold the sellers harmless from any claims and liabilities arising thereunder. Immediately after the closing, Babad and Newman told the attorney for JARU and ASCR that J.R.R. intended to replace all of the building employees.

On April 1, 1981, the day following the closing, one of J.R.R.'s partners, Chaim Babad, sent a family of five employees to live in and staff the building. That same day, Babad informed the superintendent, an elevator operator and a porter that they were discharged. Babad offered these three employees money to give up their jobs. Only one of the three accepted the offer. On April 2, the other two employees contacted the union. On April 3, union-organized picketing of the building began. Several days later, Babad again tried to induce the superintendent to leave his job and asked the superintendent to communicate Babad's offer to the other employees to make a "better deal but [with]out the union." J.App. at 45–47. Picketing continued throughout most of April. Late in the month, Babad and the union tried to settle the dispute. An agreement between J.R.R. and the union was prepared but never signed. Babad continued to negotiate directly with the six employees. By the end of the month all six employees had reached individual settlements with Babad; these settlements were conditioned upon release of all of the employees' claims against J.A.R. and J.R.R.

The union filed charges with the NLRB in April and May of 1981. The union alleged that J.R.R. committed unfair labor practices under subsections 8(a)(1), (3) and (5) of the Act when it refused to recognize and bargain with the union, when it discharged the employees because of their union membership and when it bypassed the union and negotiated individually with the employees.[2] At about the same time, the union filed a notice of intention to arbitrate against J.A.R. and J.R.R. in state court.[3]

---

1. J.R.R. is a partnership composed of Chaim Babad, Bernard Steinmetz, Emanuel Steinmetz and members of their families. Coincidentally, Alfred Rose, J.R.R.'s secretary, was secretary of JARU and vice president of J.A.R. Management. J.App. at 266, 269, 270.

2. The relevant language of the Act provides: It shall be an unfair labor practice for an employer—
(1) to interfere with ... or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

....
(3) by discrimination in regard to ... tenure of employment ... to ... discourage membership in any labor organization ...;
....
(5) to refuse to bargain collectively with the representatives of his employees....
29 U.S.C. § 158(a) (1982).

3. J.A.R. and J.R.R. moved to vacate the notice of intention to arbitrate. The New York Supreme Court granted the motion, finding no evidence before it to indicate that J.R.R. was bound by

In NLRB proceedings, the ALJ found that J.R.R. had committed an unfair labor practice when anti-union sentiment led it to discharge the predecessor's employees. The ALJ also found that J.R.R. was a successor employer under *NLRB v. Burns International Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and thus had an obligation to recognize and bargain with the union. The ALJ concluded that J.R.R. breached that obligation when it bypassed the union and dealt individually with the employees.

 A three member panel of the Board affirmed the ALJ's findings, conclusions and rulings. It adopted the ALJ's recommended order with a minor modification not relevant here. The Board now petitions for enforcement of its order. In response, J.R.R. contends that it did not assume the collective bargaining agreement and thus had no duty to bargain with the union or to recognize the union as the representative of the discharged employees. J.R.R. also contends that valid business purposes, not anti-union animus, prompted it to discharge its predecessor's employees.[4]

### DISCUSSION

 The Board's findings of fact are conclusive when they are supported by substantial evidence on the record as a whole. The Court should defer to the Board's interpretation and application of the Act in doubtful situations. *Local 259, U.A.W. v. NLRB,* 776 F.2d 23, 26 (2d Cir.1985); *see also NLRB v. Local Union No. 103, Inter-* *national Ass'n of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978); *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 691–92, 71 S.Ct. 943, 952–53, 95 L.Ed. 1284 (1951); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

 There was substantial evidence from which the Board could conclude that J.R.R. assumed the labor contract. Once covered by the contract, J.R.R. could not "terminate or modify" the contract without adhering to the requirements of 29 U.S.C. § 158(d)(1)–(4). Since J.R.R. makes no pretense of such adherence, the question of whether J.R.R. had legitimate business reasons for refusing to continue its predecessor's employees in their jobs is irrelevant to this decision.

### 1. *Adoption of the Collective Bargaining Agreement*

 There is no legal obligation to hire all of a predecessor's employees when one purchases the predecessor's business, but one may voluntarily assume the predecessor's labor contract. *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees & Bartenders International Union,* 417 U.S. 249, 261, 94 S.Ct. 2236, 2243, 41 L.Ed.2d 46 (1974); *Burns,* 406 U.S. at 287, 92 S.Ct. at 1582. In determining whether an employer has assumed its predecessor's labor contract, the NLRB is not bound by technical

the arbitration provision of the contract and finding that the union's filing of an unfair labor practice claim with the Board deprived it of jurisdiction to order arbitration. The Appellate Division modified the judgment of the Supreme Court. It affirmed the judgment of the lower court that J.R.R. was not bound by the arbitration provision. *J.A.R. Management Corp. v. Sweeney,* 86 A.D.2d 596, 446 N.Y.S.2d 193, 194 (1982).

4. J.R.R. also argues that the Board was collaterally estopped from finding that it assumed the union contract because the New York Supreme Court found that J.R.R. did not expressly agree to adopt the contract. This argument is without merit. Collateral estoppel does not apply to issues that were not "essential to the judgment." *Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 728 (2d Cir.1981). The New York courts determined that J.R.R. was not bound by the *arbitration provision* of the labor contract. The New York court relied on cases requiring an express agreement *to arbitrate. American Utex Int'l v. ICC Corp.,* 74 A.D.2d 747, 425 N.Y.S.2d 579, 580 (1980), *aff'd,* 52 N.Y.2d 888, 437 N.Y.S.2d 304, 418 N.E.2d 1323 (1981); *Kahn v. Biernbaum,* 55 A.D.2d 589, 390 N.Y.S.2d 92, 93 (1976). The New York courts did not decide, and did not need to decide, whether J.R.R. was bound by the *other* provisions of the labor contract.

rules of contract law; rather, it may adapt those rules to the collective bargaining context. *American Federation of Television & Radio Artists v. Inner City Broadcasting Corp.*, 748 F.2d 884, 886–87 (2d Cir. 1984); *NLRB v. World Evangelism, Inc.*, 656 F.2d 1349, 1355 (9th Cir.1981); *NLRB v. Donkin's Inn, Inc.*, 532 F.2d 138, 141–42 (9th Cir.), *cert. denied*, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976).

■ There is substantial evidence in the record in this case that J.R.R. assumed its predecessor's labor contract. The sale contract between JARU and ASCR, and Joshua Estates, specifically provided that the labor contract was a permitted encumbrance. At the closing both the sale contract and the labor contract were assigned to J.R.R. Moreover, J.R.R. agreed to indemnify JARU and ASCR from "all claims and liabilities arising under the . . . service and maintenance contracts." J.App. at 275. Joshua Estates, the named purchaser, was clearly acting as J.R.R.'s agent in the sale transaction. The immediate assignment of the sale contract and the deed to J.R.R. is evidence of this, as is the fact that Babad and Steinmetz, two J.R.R. partners, furnished personal checks for $110,000 of the $165,000 down payment for the sale. Furthermore, Alfred Rose, an officer of JARU and ASCR, stated that Babad and Steinmetz "were the intended purchasers of the building." J.App. at 18. Babad's repeated attempts to induce the union members to quit the union and sign releases of their claims are evidence of J.R.R.'s awareness of its obligations under the labor contract.

■ J.R.R. asserts that the agreement in the sale contract to take the property "subject to" the labor contract was not an agreement to assume the labor contract. This assertion is premised on J.R.R.'s view of New York property and contract law. Even if that view were correct, however, the Board is not bound here by principles of state contract law.

■ J.R.R. also claims that it did not execute the assignment of the labor contract. It fails to mention that Alfred Rose, who executed the agreement for the assignor, was also an officer of J.R.R. The Board was therefore permitted to conclude that Rose accepted the assignment for J.R.R. *See* note 1, *supra*.

The Board thus properly found that J.R.R., having assumed its predecessor's labor contract, was bound to abide by the terms of that contract.

### 2. *The Unfair Labor Practices*

■ The Board's finding that J.R.R. committed the unfair labor practices charged to it is supported by substantial evidence. One of J.R.R.'s partners, Babad, bypassed the union and bargained individually with the employees over the discharge of employees. This failure to bargain collectively with the union violated section 8(a)(5) of the Act. *See, e.g., NLRB v. Pepsi-Cola Bottling Co.*, 449 F.2d 824, 831 (5th Cir.1971), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2434, 32 L.Ed.2d 683 (1972).

■ J.R.R. violated section 8(a)(3) of the Act when it discharged employees because of their union membership and replaced them with non-union employees. *See NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 692 (7th Cir.1982) ("Where anti-union considerations result in the layoff of employees, the employer has violated section 8(a)(3). . . ."). J.R.R. violated section 8(a)(1) of the Act when its partner, Babad, tried to induce union members to forego the protections of their union contract by renouncing their membership in the union and releasing J.R.R. from any claims that the union or its members might have against it. *Cf. NLRB v. Monroe Tube Co.*, 545 F.2d 1320, 1327 (2d Cir.1976) (solicitation of employee's withdrawal from union would violate section 8(a)(1) if facts and circumstances suggested that coercion was likely).

The Board's petition for enforcement of its remedial order is hereby granted.