**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**AMATEYUS, LTD., d/b/a Volk & Huxley and Vulcan Typography Co., Respondents.**

No. 848, Docket 86–4149.

United States Court of Appeals, Second Circuit.

Argued March 2, 1987.

Decided May 1, 1987.

Samuel Rosen, Milgrim Thomajan Jacobs & Lee, P.C., New York City, for respondents.

Elliot Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C. (Victoria A. Higman, Attorney, Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, of counsel), for petitioner.

Before OAKES and WINTER, Circuit Judges, and ZAMPANO, District Judge.*

PER CURIAM:

The NLRB seeks to enforce an order against Amateyus, Ltd., d/b/a Volk & Huxley, and Vulcan Typography Co. (together, "the Companies"), requiring them to cease and desist from unfair labor practices prohibited by the National Labor Relations Act § 8(a)(1), (3), (5), 29 U.S.C. § 158(a)(1), (3), (5), or from otherwise interfering with the exercise of their employees' rights under section 7 of that Act, 28 U.S.C. § 157. Affirmatively, the order requires the Companies to recognize and bargain with New York Typographical Union No. 6 ("the Union"); to give retroactive effect to the collective bargaining agreement with the Union; to restore wages and conditions to the status quo ante existing before Union recognition was withdrawn; to offer to reinstate and compensate employees; and to post appropriate notices. The Board's order is reported at 280 N.L.R.B. No. 21 (May 30, 1986). We affirm on the basis that there is ample support in the record for the NLRB's findings that Amateyus adopted its predecessor's collective bargaining agreement and that Vulcan Typography Co. ("Vulcan") was Amateyus's alter ego.

Amateyus bought Volk & Huxley, a typography and composition shop, from Imperial Ad Service Corporation in 1981. Volk & Huxley employees had been represented by the Union for almost thirty years, and Volk & Huxley, as a member of the Printers' League Section of the Printing Industries of Metropolitan New York, Inc., was bound by the collective bargaining agreement between the League and the Union. After purchasing Volk & Huxley, Amateyus continued to operate the business in the same location, and it employed all the composing unit employees (the relevant bargaining unit) and two key salesmen, Ed Trager and Steve Hoffman, previously employed by Volk & Huxley. Furthermore, Amateyus followed the terms of the Union's collective bargaining agreement as regards hours, wages, holidays, and layoff procedures. Amateyus also checked off Union dues and employee vacation fund deductions, and remitted these sums to the Union. After Amateyus became delinquent in October 1981 in remitting employer contributions to Union benefit and productivity, pension, and welfare funds, its president, John Cory, met with the Union business agent, Murray Itkowitz, and agreed to pay $5,000 weekly to become current. Amateyus later made two payments, of $5,000 and $5,100.54, to the Union's benefit and productivity fund. At about the same time, Cory sought from the Union some changes in the Union contract, submitting a written proposal to the Union president that in exchange for an increase in the number of Union employees, the Union should eliminate from the contract the productivity assessment, reduce the welfare assessment by half, and change various work classifications. The Union did not agree to these contract modifications. On these facts, the NLRB found that Amateyus had adopted Volk & Huxley's Union contract, so that its later violation of the contract was an unfair labor practice.

In January 1982, a month after the Union had refused to modify the collective bargaining agreement, John Cory leased offices next door to Amateyus's offices, paying an $11,000 security deposit. Then John's 20–year-old college-student brother, Marc, incorporated Vulcan and set up a typography and composition shop in the premises John had leased. All Amateyus's equipment not subject to lien was eventually moved over to Vulcan's shop. Marc also bought a substantial amount of new equipment for Vulcan, and there was evidence that John was largely instrumental in Marc's obtaining credit for these purchases. Marc, at John's suggestion, hired Amateyus's night foreman, John Sartori, as Vulcan's general manager. Sartori in turn recruited Amateyus employees for Vulcan. When offering a job to employee Robert Mariani, Sartori told him he should either "go with [Vulcan] or you're going to go

* Of the District of Connecticut, sitting by designation.

down. You're better off going with them, because the Union can't get you any work."

At the very same time that Vulcan was setting up shop, Amateyus was laying off bargaining unit employees and subcontracting work out. And when Vulcan opened, Amateyus's two key salesmen moved there, as did various other Amateyus employees, including an aunt of the Corys, who was the bookkeeper, and two family friends who occupied administrative positions. There was evidence that John Cory himself worked for and was paid by Vulcan at $1,000 per week for ten weeks. Vulcan operated a nonunion shop and paid rates below those fixed in Amateyus's collective bargaining agreement. Amateyus ceased operations altogether by laying off its two remaining employees in March 1982. On these facts, the NLRB held that Vulcan was the alter ego of Amateyus and was therefore bound by Amateyus's collective bargaining agreement.

Amateyus argues that under *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 294–95, 92 S.Ct. 1571, 1585–86, 32 L.Ed.2d 61 (1972), it was *required* as a successor to Volk & Huxley to bargain with the incumbent Union over the initial terms or conditions of employment. Accordingly, it argues, that in at first following the contract terms it was merely attempting to maintain the status quo prior to negotiating with the Union and this cannot be said to be evidence that Amateyus had *adopted* the terms of Volk & Huxley's collective bargaining agreement. This position is inconsistent, however, with the interpretation of *Burns* by this court in *Nazareth Regional High School v. NLRB*, 549 F.2d 873 (2d Cir.1977), where it was held that an employer was bound to bargain before fixing the initial terms and conditions of employment only if "all of the employees ... have ... been promised re-employment on the existing terms." *Id.* at 881. There appears to have been no such express promise here, so under *Burns* with its *Nazareth* gloss, Amateyus would have been entitled to determine its initial employment terms without involving the Union.

The record indicates, however, that Amateyus did not bargain with the Union over the initial terms but instead chose to adhere to the terms of the Union's agreement with Volk & Huxley. On these facts, the NLRB was perfectly entitled to find that Amateyus operated in accordance with the collective bargaining agreement and intended to adopt it. *See Burns*, 406 U.S. at 291, 92 S.Ct. at 1584; *see also NLRB v. Babad*, 785 F.2d 46, 49–50 (2d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986). Perhaps the strongest evidence of adoption is that John Cory in fact tried to negotiate certain modifications of the contract with the Union, even as Amateyus adhered to the terms of the contract and gave no indication that in any way it would not do so.

In determining whether Vulcan was the alter ego of Amateyus, the NLRB looked at the usual factors—whether Vulcan had substantially the same business purpose, operations, equipment, customers, management and supervision as Amateyus, *see NLRB v. Campbell-Harris Electric, Inc.*, 719 F.2d 292, 295 (8th Cir.1983); whether it was controlled by the old employer, *see id.* at 295–96; and whether it was incorporated in order to evade obligations to the Union, *see Fugazy Continental Corp. v. NLRB*, 725 F.2d 1416, 1419 (D.C.Cir.1984). Substantial evidence supports the NLRB's conclusion that Vulcan was Amateyus's alter ego and so was bound by Volk & Huxley's collective bargaining agreement. The evidence shows that in addition to the continuity of operations between the Companies and the retention of equipment, furniture, and fixtures, there was a continuity of personnel. John Cory continued to play a central role in Vulcan, being instrumental, for example, in obtaining financing for Vulcan's new equipment. Vulcan also retained Amateyus's two key salesmen, as well as other staff. The evidence showed too a lack of arm's-length dealing between the Companies (e.g., as regards the lease on Vulcan's premises, which Amateyus took out and for which it paid the security deposit), and an

intent to avoid contract obligations (demonstrated, for example, by Sartori's statements that the Union was forcing Amateyus's closure, and that Vulcan would be nonunion).

Once it is established that Vulcan was bound by the agreement as an alter ego of Amateyus, it is also clear that it violated the National Labor Relations Act: it repudiated the contract then in effect, changed terms and conditions, refused to recognize the Union, and subcontracted work without bargaining, in breach of section 8(a)(1) and (5), 29 U.S.C. § 158(a)(1) and (5); and it unlawfully discriminated against union members by conditioning their employment on their abandoning Union membership, in breach of section 8(a)(1) and (3), 29 U.S.C. § 158(a)(1) and (3). Amateyus violated the latter provisions when it laid off employees because of their Union membership and threatened plant closure because of their Union adherence.

This leaves us with Amateyus's and Vulcan's argument that the Administrative Law Judge ("ALJ") was biased. We do not think the argument frivolous—for instance, we find offensive the ALJ's inexplicable and uncalled-for references to the two key salesmen as "the Marx Brothers," and the ALJ's premature and sarcastic incredulousness about Marc Cory's capacity to run the Vulcan business—evidently he was a young-looking twenty—was at the very least injudicious. But no formal motion and affidavit of bias was filed, as counsel belatedly admits was the proper procedure to follow under Board Rules and Regulations § 102.37.

Perhaps the most difficult point in the case involves the ALJ's challenge to Marc Cory's presence in the sequestered hearing room by saying to counsel, "[W]hat are you going to do, tell him he's President of Vulcan?," this before any employer's testimony had been taken, coupled with the ultimate determination not to credit John and Marc because that "[a]part from apparent inconsistencies in their testimony, ... their demeanor and action as witnesses would be sufficient to discredit them. At various times in their testimony both John and

Mark [*sic*] were brash, arrogant, hostile and uncooperative." One can understand a certain amount of hostility and uncooperativeness, given the ALJ's prior remark. On the other hand, when Marc Cory came into the hearing room it was counsel who said Marc was a representative of one of his clients and then that he was president of Vulcan. This was apparently the first time this had been suggested to the ALJ, so his surprise was understandable, though this does not justify, even if it does go to mitigate, the comment.

In the end, however, there were contradictions by the brothers of each other's testimony regarding John's work for and wages from Vulcan and his advice as to alterations of Vulcan premises, and the testimony of each was contradicted by external or third-party evidence. For example, Marc's professed lack of knowledge that a union represented Amateyus employees was contradicted by evidence that he had worked at Amateyus while going to school and had discussed with Sartori the hiring of people and setting of terms and conditions of employment. In light of these contradictions, the ALJ's decision not to credit the Corys' testimony was justifiable.

Order enforced.