**MANHATTAN EYE EAR & THROAT HOSPITAL, Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner,**

**Local 1199, Drug, Hospital and Health Care Employees Union, RWDSU, AFL–CIO, Intervenor.**

**Nos. 1161, 1370, Dockets 90–4138, 90–4184.**

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1991.

Decided Aug. 15, 1991.

Rehearing Granted and Opinion Amended Oct. 24, 1991.

Francis Carling, New York City (Michael A. Kalish, Frederick A. Brodie, Maria M. Homan, Winthrop, Stimson, Putnam & Roberts, of counsel), for petitioner-cross-respondent, Manhattan Eye, Ear & Throat Hosp.

Margaret Bezou, Atty., N.L.R.B., Washington, D.C. (Collis Suzanne Stocking, Supervisory Atty., Jerry M. Hunter, General Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent-cross-petitioner, N.L.R.B.

Harold Ickes, Mineola, N.Y. (Jeffrey G. Stark, Barry J. Peek, Meyer, Suozzi, English & Klein, P.C., of counsel), for intervenor, Local 1199 Drug, Hosp. and Health Care Employees Union, RWDSU, AFL-CIO.

Before OAKES, Chief Judge, and LUMBARD and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

On this appeal we consider whether a remedy imposed by the National Labor Relations Board may successfully be challenged by an employer or whether it should be enforced, as requested by the Board in its cross-appeal. While the employer believes the remedy was imposed as a punitive measure, the Board relies on the broad discretion accorded it under the National Labor Relations Act (the Act) to shape remedies arising from unfair labor practices. The basic question to be answered in such litigation is whether the remedy effectuates the purposes of the Act. If it does, it will be enforced; otherwise, not.

In the case at hand an employer withdrew recognition from a union at the request of a majority of its employees, and immediately removed those employees from union health and pension benefits programs, placing them in management-run plans. Several years later, the withdrawal of recognition was held to be void because an unfair labor practice occurred during the period when the petition for withdrawal of recognition took place but which, significantly, was not found to have influenced the petition. At the employees' request, the union then negotiated to keep the employees in the management-run plans and—when faced with a decertification election it was certain to lose—disclaimed any further interest in representing the employees.

Even though the employees had requested the original withdrawal of recognition and were fully compensated thereafter by equivalent or superior management-run plans, and the union had disclaimed any future interest in representing them, and union funds had suffered little or no loss from the employer's actions, the National Labor Relations Board ordered the employer to pay approximately $2.2 million in retroactive payments to the union health and pension funds (including interest). Because this remedy fails to benefit the employees, results in a windfall for the union funds, and is punitive to the employer, we remand to the Board for recalculation of the remedy.

BACKGROUND

In June 1984 Local 1199, Drug, Hospital and Health Care Employees Union (Local 1199 or union), called a city-wide hospital strike in New York City. The registered nurses employed by Manhattan Eye Ear & Throat Hospital (hospital), whom the union had represented since 1981, were required to join the strike. On July 18, 1984 shortly after the strike commenced, the nurses—dissatisfied with their representation—filed a decertification petition that resulted in an election being scheduled for August 30. Later that summer a part-time hospital relief nursing supervisor, Euphemia James, while talking with four nurses on the telephone asked whether they planned to cross the picket line. On August 2 the union filed an unfair labor charge alleging that James had threatened the four nurses in an attempt to get them to resign from the union. By filing this charge, it succeeded in blocking the scheduled August 30 decertification election.

The nurses were caught in a dispute that threatened to extinguish their statutory right to select representation of their own choosing, see 29 U.S.C. §§ 157, 159 (1988). Hence, a majority of nurses responded to the union's unfair labor charge by petitioning the hospital on September 6 to withdraw union recognition. This presented the hospital with a delicate dilemma: on one hand it had a demand from a majority of the bargaining unit that it cease recognizing the union—denial of that demand could constitute an unfair labor practice under §§ 158(a)(1)–(2) of the Act; on the other hand, with the union's unfair labor practice charge pending, withdrawal of recognition might later be found tainted by James' conduct, were it to prove wellfounded. James advised the hospital that she had not told any employee to resign from the union. There is no evidence that, even were the union's allegations proved, they would show a *nexus* between James' alleged conduct and the decision by a majority of the nurses to petition for withdrawal of recognition. Under these circumstances, the hospital resolved its pre-

dicament by acceding to the nurses' demand and withdrawing union recognition.

After withdrawal, the hospital transferred the nurses out of the joint union/management National Benefit Fund for Hospital and Health Care Employees (Joint Benefit Fund) and National Pension Fund for Hospital and Health Care Employees (Joint Pension Fund) (collectively Joint Funds), and into the hospital's own medical insurance program (Hospital Medical Plan) and the Pension Plan of the League of Voluntary Hospitals and Homes of New York (League Pension Plan) (collectively Management Plans). This action severed the nurses' contact with the union, and eventually led to the backpay proceeding that is at the heart of this litigation.

Following a hearing on the unfair labor practice charge in March 1985, an Administrative Law Judge (ALJ) dismissed the complaint on August 16, 1985. The ALJ determined that James' comments to the nurses were "devoid of coercion." In light of this conclusion, the ALJ did not decide whether there was any nexus between James' alleged actions and the nurses' decision for union decertification.

The union appealed, and on May 30, 1986—almost two years after the events in question—the Board overruled the ALJ. It did not address whether James' conduct actually influenced the nurses' demand for withdrawal of recognition in any way, nor could it since those facts were not in the record before it. The Board simply held the hospital's withdrawal of recognition unlawful because it did not occur "in a context free of unfair labor practices of the type aimed at causing disaffection from the Union." Accordingly, the Board required the hospital to

> On request, restore the terms and conditions of employment in existence prior to the unlawful unilateral changes and make whole the employees for any losses suffered by reason of the unlawful unilateral changes and make contributions to the [Joint Funds], if any, which would have been made but for the [Hospital's] unilateral institution of the pension, health, and insurance plans.

Regarding the scope of the remedy, the Board stated:

> In ordering the [Hospital] to make whole the employees for losses suffered by reason of its implementing new pension, health, and insurance plans, we note that the record is unclear whether the new plans were substitutes for preexisting benefit plans and whether any losses were incurred by this conduct.

We upheld the Board's decision in an unpublished opinion. *NLRB v. Manhattan Eye, Ear & Throat Hospital*, 814 F.2d 653 (2d Cir.1987).

On August 25, 1988 the hospital and the union signed a successor collective bargaining agreement, which maintained the nurses in the Management Plans retroactive to July 1, 1987. The nurses had demanded that they be allowed to remain in these plans, and the union had negotiated with management accordingly. The agreement did not affect the period from September 1984 to June 31, 1987, that is, the period after the hospital had discontinued payment to the Joint Funds and instead was providing alternative benefits through the Management Plans.

A backpay specification to remedy the effects of the hospital's adjudicated unfair labor practice resulted in hearings before the ALJ in July and August 1988. The ALJ denied the hospital's request that it be permitted to offer evidence to show that neither the nurses nor the Joint Funds incurred any loss from the hospital's actions. Evidence of the adverse financial impact on the hospital of the order compelling it to make retroactive payments to the Joint Funds was also rejected.

The ALJ's decision, rendered on April 6, 1989, gave the hospital no credit for its provision of benefits to the nurses under the Management Plans during the same period. Instead the ALJ ordered the hospital to pay approximately $2.2 million to the Joint Funds, on the ground that the hospital would have paid that amount to the Funds had the nurses not unilaterally been withdrawn from them by the hospital.

While the hospital's appeal of that decision was pending, the Board determined, in

response to the nurses' decertification petitions filed in July and October 1984, that a decertification election would be held on January 31, 1990—more than five years after the originally scheduled date. Faced with an election it was virtually certain to lose, the union bowed out on the eve of the election. In a letter dated January 30 it informed the Board that it "disclaim[ed] any further interest in representing the nurses at the [Hospital]." As a prerequisite to allowing the election to proceed, the Board required the hospital to pay the entire amount of $2,158,030 to the Joint Funds ordered by the ALJ, subject to the outcome of this appeal. The money to make this ordered payment came from the hospital's endowment, and is presently being retained by the Joint Funds.

Eight months after the union disclaimed interest in representing the nurses, the ALJ's backpay decision was affirmed by the NLRB in a Supplemental Decision and Order dated September 28, 1990. In its opinion the Board stated "[i]t is well settled that the appropriate remedy for unlawful withdrawal of recognition and unilateral changes in employee benefits is the restoration of the *status quo ante,* or conditions as they would have existed but for the unfair labor practices." In support of this proposition, the Board cited *Hinson v. NLRB,* 175 NLRB 596 (1969), *enf'd,* 428 F.2d 133 (8th Cir.1970), where it had held that, in cases of unilateral action, the appropriate remedy is to reinstate the previous status until the employer fulfills its bargaining obligation by either bargaining out a new agreement or bargaining to impasse. According to the Board, it was "of no moment" that the hospital provided other benefits in the interim since, it concluded, to allow the employer to "evade or reduce its liability for unpaid contributions by reason of such substitute benefits not only would leave the unfair labor practice unremedied but would, in effect, underwrite the [employer's] unlawful acts." Rather, the Board held "the Act's purpose of protecting the collective-bargaining process is, in our view, best served by requiring [the hospital] to restore the *status quo ante* through the mechanism of adherence

to the terms of the agreements they have negotiated."

The Board also rejected the hospital's contention that the nurses and Joint Funds had suffered no loss for which they needed to be made whole. Regarding the nurses' losses, it stated: "[t]here can be no doubt that employees have, in addition to a stake in receiving benefits negotiated on their behalf by their chosen representatives, a clear economic stake in the viability of funds to which part of their compensation is remitted." Although it acknowledged that the nurses were not represented by the union at the time of the hearing, it dismissed this point as irrelevant, believing the nurses' status subject to change.

As to the funds, the Board presumed that an employer's failure to contribute harmed the funds, citing *Stone Boat Yard v. NLRB,* 715 F.2d 441, 446 (9th Cir.1983) ("Even if [the employer's] substitute fringe benefit program met the present needs of its employees, the diversion of contributions from the union funds undercut[s] the ability of those funds to provide for future needs"), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). Accordingly, the Board affirmed the ALJ's decision in all respects. It provided no instruction on what the Joint Funds were to do with the $2.2 million. This petition for review and cross-petition for enforcement followed.

## DISCUSSION

### I  Res Judicata

Intervenor Local 1199 argues that the issues raised in the hospital's petition for review regarding its liability to the Joint Funds were previously decided by us and that the petition for review, under the *res judicata* doctrine, must be dismissed. It contends that when we upheld the Board's initial Order requiring the hospital to make contributions to the benefit trust funds, we decided the issue central to the current appeal.

Under *res judicata,* upon a final judgment on the merits parties to a suit are barred, as to every matter that was offered

and received to sustain or defeat a cause of action, as well as to any other matter that the parties had a full and fair opportunity to offer for that purpose. *See Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4402, at 7 (1981). A related theory—the "law of the case" doctrine—applies to bind a lower court with respect to issues that have been decided either expressly or by necessary implication by an appellate court at an earlier stage of the proceedings. *See Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1056 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990). Here, the Board's prior decision would, if anything, constitute the "law of the case" since it was an interim order of the Board that we affirmed. But we do not think the law of the case applies because the disputed issue now before us was not ruled on in our prior decision.

■ A careful reading of the Board's first decision reveals that though the May 30, 1986 order ruled on the hospital's liability, it left open the precise remedy to be imposed in the ordered backpay proceeding. Footnote eight of that decision states

> In ordering the Respondent to make whole the employees for losses suffered by reason of its implementing new pension, health, and insurance plans, *we note that the record is unclear whether the new plans were substitutes for preexisting benefit plans and whether any losses were incurred by this conduct.* We shall order that the employees be made whole for such losses, if any, they may have incurred, and that the Respondent make the contributions to benefit trust funds, which would have been made, but for the Respondent's unilateral institution of pension, health and insurance plans. (emphasis added).

This footnote evinces the Board's intent to leave for another day the determination of what, if any, relief might be appropriate, under accepted labor law principles. The Board did not reach this issue, and the

record in the backpay proceeding shows that the parties vigorously debated what remedy the Board intended. Deferring the remedy to the compliance or backpay proceedings is entirely consistent with longstanding administrative practice of the NLRB, one which has received the imprimatur of the Supreme Court. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902, 104 S.Ct. 2803, 2814, 81 L.Ed.2d 732 (1984) (compliance proceedings provide the "appropriate forum" for tailoring the remedy to suit the individual circumstances of each case).

Consequently, we conclude that the prior decision of the Board, and our affirmance of it, does not constitute either "law of the case" or *res judicata* on the issue of what, if any, contributions the hospital must make to the benefit trust funds. We turn, therefore, to address that issue.

## II  The Board's Remedy Decision

### A.  *The Standard of Review*

■ The National Labor Relations Board is vested with broad discretion to fashion remedies for violations of the National Labor Relations Act. 29 U.S.C. § 160(c). Because of the Board's special expertise in labor disputes, we accord deference to the remedy it imposes; as a corollary, the remedy is subject only to limited review, *see Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 189 (2d Cir.1991), and it will not be overturned if it may fairly be said to have as its purpose ends that will effectuate the policies of the Act. *See Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964); *NLRB v. Future Ambulette, Inc.*, 903 F.2d 140, 144 (2d Cir.1990).

■ The policies of the Act are "essentially remedial." *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10, 61 S.Ct. 77, 78–79, 85 L.Ed. 6 (1940) ("The Act does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees."). The Board's task is to craft an order, and an appellate court will ordinarily enforce it, unless the order is viewed as penal or con-

fiscatory. *Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60, 67 (2d Cir.1979). For the award to be remedial, it must compensate for the injury actually suffered by the employees. *Sure–Tan Inc.*, 467 U.S. at 900, 104 S.Ct. at 2813 ("a backpay remedy must be sufficiently tailored to expunge only the *actual*, and not merely *speculative*, consequences of the unfair labor practices") (emphasis in original).

### B. *Review of the Board's Decision*

◼ The hospital takes strong exception to the remedy ordered by the Board on several grounds. First, it asserts the nurses suffered no loss of benefits *in the past* because they were compensated for losing their entitlement to the Joint Funds by the equal or superior substitute coverage provided by the Management Plans. Second, given the fact that the union prior to the Board's decision disclaimed any interest in representing the nurses in the future, the hospital insists the very basis for the Board's decision to require the $2.2 million payment to the Joint Funds—the nurses alleged economic stake *in the future* financial stability of the Joint Funds—is unsupported by the record. This would mean, the hospital declares, that the Joint Funds suffered no loss either, and the payment to them could only be described as a large and unexpected windfall, the only purpose of which is to punish the hospital.

It is true that the hospital unlawfully discontinued payments to the Joint Funds and that the nurses lost the benefits they would have received under the Joint Funds' pension and benefit plans. Nevertheless, the hospital made substitute payments to the Management Plans permitting the nurses to receive substitute benefits. From September 1984 to July 1987 the injury the nurses suffered from losing their entitlement to the Joint Funds was largely compensated for by their substitute coverage under the Management Plans. To the extent it was not—that is, nurses were denied coverage under the Management Plans which they would have received under the Joint Funds—the hospital concedes it must make its employees whole,

and has repeatedly offered to make backpay reparations accordingly.

Aside from such past losses, the nurses were harmed only to the extent that the hospital's termination of payments to the Joint Funds reduced the nurses' ability to draw on the Joint Funds *in the future.* The Board's award of backpayments apparently was based on this perceived loss—and upon its belief that restoration of the Joint Funds' financial vitality was necessary to satisfy the nurses' future needs in the Joint Funds—since that was the rationale of *Stone Boat Yard,* relied upon in the Board's decision. *See* 715 F.2d at 446.

But there is little or no evidence to support the Board's conclusion that the nurses retained any future interest in the Joint Funds let alone the "clear economic stake" cited by the Board. After all, the nurses were, at the time of the hearing, no longer represented by the union, and it had disclaimed any future interest in representing them. The Board's bald dismissal of this fact—its statement in a footnote that their status with respect to the funds is subject to change—is unsatisfactory, since the possibility that the nurses might later seek coverage under the Joint Funds is too speculative a basis on which to base a backpay award. *See Sure–Tan, Inc.,* 467 U.S. at 900.

The Board's decision simply to presume damages to the Joint Funds without supporting evidence is equally unsatisfactory for the same reason; it is speculative. It also is grounded on a second presumption, namely, that had the hospital not taken its action in ceasing payments to the Joint Funds—and the *status quo* truly been restored—the negotiations between the parties would have resulted in continued payments to the Joint Funds. Given the nurses' early and determined efforts to rid themselves of the union, this underlying presumption is more than just a trifle suspect.

*Sure–Tan* mandates that before the Board may award backpayments for failure to pay into the Joint Funds, it must have concrete evidence that the nurses have an economic interest in the future of those

Joint Funds. A suspect presumption is not concrete evidence. Hence, the Board's decision rests on a flawed foundation. We proceed to examine the relationship of the nurses to the Joint Funds to determine if there is any legitimate basis for concluding that the nurses had an economic stake in the funds.

### 1. The Joint Pension Fund

Review of the record suggests the nurses may still have some economic stake in the Joint Pension Fund. Several people— William Abelow, co-counsel of the Joint Funds; Patrick Sheil, Director of Human Resources at the Hospital; and Donald Klein, General Counsel for the Joint Funds—testified that the Joint Pension Fund and the League Pension Fund have a reciprocal agreement under which each fund will recognize time accrued in the other program for determining whether pension rights have vested. Once the total number of years in both programs equals ten, the pension rights vest; at this point reciprocity ends, and benefits are then determined separately under the rules of each program.

Thus, even though the nurses are no longer covered by the Joint Pension Fund they will continue to draw retirement benefits from that Fund to the extent those benefits vested during the time—from 1981 until July 1987—that they were covered. This is concrete evidence the nurses retain an economic interest in the Joint Pension Fund's future vitality, and cannot be made whole unless the solvency of the Joint Pension Fund is assured. The Board should therefore impose a remedy that restores that Fund's financial strength.

Such a remedy should recognize that if the Fund suffered a loss, that loss would not equal the full amount of contributions not made by the hospital from September 1984 to July 1987. Rather, it would equal the difference, if any, between contributions not made by the hospital during that period and an estimation of nurses' claims that it anticipated would have been paid, but that were not; that is, the "profit" the Fund would have made on the nurses.

Any amount beyond that would represent a windfall for the Fund and, because it fails to benefit the employees, a penalty to the hospital. A windfall payment is not a remedy that is consistent with the Act's purposes. *See Republic Steel Corp.*, 311 U.S. at 10, 61 S.Ct. at 78–79. On remand, the Board should calculate the losses to the Joint Pension Fund in light of this discussion and—given the nurses' continued interest in the Joint Funds' stability—order the hospital to make whole any actual loss the Fund may have incurred.

### 2. The Joint Benefit Fund

Unlike the Joint Pension Fund, the nurses no longer have any economic stake in the Joint Benefit Fund. Both Abelow and Klein testified that once contributions to the Joint Benefit Fund were terminated, the Fund no longer had any obligations to pay benefits to the nurses. Moreover, the nurses have disclaimed all future interest in the Joint Benefit Fund. They thus have no interest in the *future* stability of that Fund, and its restoration is not required to make the nurses whole. Again, any payment ordered to that Fund would be a windfall for it and would improperly penalize the hospital. This is particularly so in light of other testimony establishing that the nurses were a drain on this Fund— collecting more in benefits than was contributed on their behalf during the relevant period—tending to prove the Fund was actually better off financially without them.

But, the nurses may have sustained some losses. They may have been denied benefits under the Management Plan during the period from September 1984–July 1987 that they would have been granted under the Joint Funds. Whether the nurses sustained any such *past* losses is unclear; the parties dispute this issue on appeal, with the hospital contending its benefits plan was superior in all respects to that supplied by the Joint Fund—negating the possibility of these losses occurring at all—and the union and Board contending at least two individuals may have suffered losses of this nature. On remand, the Board should hear evidence to determine this issue. We

note again that the hospital has offered to pay these losses to resolve this matter.

### C. *The Board's Remedy Jurisprudence*

In finding an economic stake in the future of the Funds for the nurses and in presuming losses to the Joint funds from the hospital's actions, the Board claimed it had "underscore[d its] adherence to the remedial principles of *Stone Boat Yard.*" It also said it was expressly overruling *Hassett Maintenance Corp.*, 260 NLRB 1211 (1982), "and similar cases to the extent that they are inconsistent with this decision." The Board's decision to overrule *Hassett* in arriving at the remedy imposed in this case is, therefore, significant.

In a series of decisions going back to 1972 (including *Hassett*), the NLRB had held that it was punitive, did not benefit the employees, and represented a windfall to the union funds to require employers who had unlawfully provided substitute benefits to their employees to make retroactive payments into union-run benefit funds and to refuse to allow them to deduct those substitute payments. Remedies requiring such duplicative payments were rejected by the Board as inconsistent with the remedial purposes of the Act. *See Schmidt–Tiago Constr. Co.*, 286 NLRB 342, 370–71 & n. 52 (1987); *Rockland Lake Manor, Inc.*, 263 NLRB 1062, 1071 & n. 37 (1982); *Hassett Maintenance Corp.*, 260 NLRB 1211, 1212 & n. 7 (1982); *Turnbull Enterprises, Inc.*, 259 NLRB 934, 935 (1982); *James A. McBrady, Inc.*, 238 NLRB 847, 853 & n. 21 (1978); *Crest Beverage Co.*, 231 NLRB 116, 120 & n. 10 (1977); *Wayne's Olive Knoll Farms, Inc.*, 223 NLRB 260, 266 & n. 14 (1976); *Coletti Color Prints, Inc.*, 204 NLRB 647, 648 (1973); *Service Roofing Co.*, 200 NLRB 1015, 1017 & n. 1 (1972).

At the same time the Board was developing another line of cases requiring employers who unilaterally discontinued contributions to union-sponsored benefit funds to reinstate the *status quo ante* by making all retroactive payments to those plans until the parties bargained to a new agreement or reached an impasse. *See Roman Iron Works, Inc.*, 292 NLRB No. 142 (1989); *The Peele Co.*, 291 NLRB No. 95 (1988); *Achilles Constr. Co.*, 290 NLRB No. 34 (1988), *enf'd*, 875 F.2d 308 (2d Cir.1989); *Mohawk Steel Fabricators, Inc.*, 289 NLRB No. 135 (1988); *Master Iron Craft Corp.*, 289 NLRB No. 130 (1988); *Zaffino & Sons, Inc.*, 289 NLRB No. 76 (1988); *Stone Boat Yard*, 264 NLRB 981 (1982), *enf'd*, 715 F.2d 441 (9th Cir.1983), *cert. denied*, 466 U.S. 937 (1984); *Schorr Stern Food Corp.*, 248 NLRB 292 (1980); *Pacific Aggregates, Inc.*, 231 NLRB 214 (1977); *Hinson v. NLRB*, 175 NLRB 596 (1969), *enf'd*, 428 F.2d 133 (8th Cir.1970).

The instant matter takes on importance because it represents the first time the Board has acknowledged the inconsistency of its two lines of cases. In overruling *Hassett*, the Board held that the *only way* to effectuate the policies of the Act and to make employees whole for an employer's unilateral action in discontinuing payments to union-run benefit funds is to require the employer to make all retroactive payments to those funds—regardless of the nature or scope of the substitute benefits provided to the employees in the interim. For the reasons just discussed, we believe when the Board did this it exceeded its authority.

By refusing to enforce the Board's decision in this case we do not hold that in the exercise of its broad remedial power, it is not empowered to order imposition of the *status quo ante* in other cases where an employer unilaterally discontinues payments to union-sponsored benefit funds. *See NLRB v. Amateyus, Ltd.*, 817 F.2d 996 (2d Cir.) (affirming NLRB order requiring employer to restore matters to those that existed before union recognition was withdrawn), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987). We simply rule that, in the matter at hand, where the employees—who were compensated during the relevant period by substitute benefit plans and who, prior to the Board's decision, disclaimed any present or future interest in being covered by the Joint Funds—have little economic stake in the future financial stability of those funds, imposition of the *status quo ante* does not serve the remedial purposes of the Act

because it fails to benefit the employees, is unduly harsh on the employer, and results in a windfall for the union funds.

## III Other Issues

### A. *Evidentiary Motions*

 Further, to the extent the Board refused the hospital's request to submit evidence on the subject of the *actual losses* suffered by (a) the nurses and (b) the Joint Funds, it abused its discretion since this evidence is necessary for proper determination of the backpay remedy. *See Carpenter Sprinkler,* 605 F.2d at 68. On remand, such evidence should be received as will enable the Board to render its decision in accord with the remedial principles we have discussed. It was also an abuse of discretion for the Board to refuse to hear evidence of the adverse economic effects the remedy might have on the hospital, *id.* at 68, a not-for-profit institution. The hospital was not seeking to make money for non-existent shareholders at the union's expense and, no matter how egregious the unfair labor practice, the employees can hardly be said to have benefitted if the proposed remedy puts their employer out of business. The Board's refusal to entertain this proof only reconfirms our conclusion that its aims in fashioning the remedy in this case were essentially punitive, and not to effectuate the policies of the Act.

### B. *Restitution*

Because the Board's remedy of restoration of the *status quo ante* is inappropriate in the factual context of this case, the hospital is entitled to be repaid the full amount of money it tendered; to wit, $2,158,030. *See Kwatcher v. Massachusetts Service Employees Pension Fund,* 879 F.2d 957, 966–67 (1st Cir.1989) (employer entitled to restitution of amounts paid to, and unjustly retained by, employee pension fund). The Joint Funds may at some later date be found to be entitled to some payment, but their retention of the over two million dollars since July 28, 1989 is unwarranted and inequitable. *See NLRB v. United States Steel Corp.,* 278 F.2d 896, 901 n. 12 (3rd Cir.1960) (powers conferred on court by National Labor Relations Act to enforce orders of the Board are equitable in nature), *cert. denied,* 366 U.S. 909, 81 S.Ct. 1084, 6 L.Ed.2d 234 (1961).

## CONCLUSION

Enforcement of the Board's order is denied and the matter is remanded to the Board for recalculation of the remedy in a manner not inconsistent with this opinion. Further, we conclude that the hospital is entitled to restitution of the monies which have been held by the Joint Funds since July 28, 1989, with interest. Because the Board directed payment *to* the Joint Funds, the Board is hereby instructed to use its best efforts to ensure that the said restitution is effectuated. The union, insofar as it exercises authority over the Joint Funds, is likewise so directed.