**A & P BRUSH MFG. CORP. and its Alter Ego A & P Diversified Technologies, Inc., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

**Docket Nos. 97–4117, 97–4171.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1998.

Decided April 6, 1998.

Leon Segen, New York City, for Petitioner/Cross–Respondent.

Leslie Randolph, Attorney, National Labor Relations Board, Washington, DC (Peter Winkler, Supervisory Attorney, Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Washington, DC, of Counsel), for Respondent/Cross–Petitioner.

Before: FEINBERG, KEARSE and JACOBS, Circuit Judges.

FEINBERG, Circuit Judge:

A & P Diversified Technologies, Inc. ("Diversified") petitions for review of a March 1997 order of the National Labor Relations Board (the "Board"), 323 NLRB No. 44, 1997 WL 148696 (1997), modifying and affirming a decision and order issued by Administrative Law Judge Steven Davis. The Board found Diversified to be the alter ego of A & P Brush Manufacturing Corp. ("Brush") and, therefore, in violation of Sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(5), (a)(1), for failing to honor Brush's collective bargaining agreement. The Board cross-petitions for enforcement of its order which, among other things, compels Diversified to comply with the terms of the agreement and, on request, to recognize and bargain with the union that represented Brush's employees, Local 60 of the Luggage Workers Union (the "Union"). We conclude that the Board's finding of alter ego status is supported by substantial evidence, and grant enforcement of that part of the Board's order. However, we vacate the order to recognize and bargain with the union, and remand to the Board for further proceedings.

## I. Background

Brush was a paint brush manufacturer located in the Bronx. In 1984, Jacob Krantz bought out his brother and became sole owner of Brush. He hired his son Mark as a vice-president. In 1989, Jacob transferred his stock to his wife Gertrude, and Mark took over the day-to-day operations of Brush. Although certain major decisions required Gertrude's approval, Mark Krantz essentially ran Brush. As early as 1993, Mark began to consider taking over the business in some form and perhaps moving it. In June 1994, he incorporated two new entities, Diversified and A & P Diversified Technologies Realty, Inc. ("Realty"), in which he was the sole shareholder. Mark's mother Gertrude was an unsalaried vice-president and treasurer of Diversified and his brother Ronald Krantz also was an officer. In October 1994, Diversified contracted with Gertrude Krantz to purchase Brush's equipment, inventory and supplies for $815,000, their approximate fair market value, payable over 20 years. Selling the assets, rather than the corporation's stock, permitted Gertrude to realize a $100,000 tax loss she otherwise would not have been able to use. In February 1995, Natwest Bank loaned Realty $900,000 to purchase a building in Metuchen, New Jersey. Gertrude subordinated the debt Diversified owed her to the bank loan and pledged her stock in Brush to Natwest to secure the mortgage. Gertrude also acted as a guarantor for the loan. Part of the New Jersey building houses Diversified; Realty rents out the remaining space.

Meanwhile, by December 1994 the Union was aware of the impending transition, and Union president Juan Borgos contacted Mark Krantz to discuss the impact of the change on Brush's employees. Mark apparently told Borgos that Brush was closing, that Diversified would be run as a non-union shop and that because Brush was closing rather than moving, Diversified would nei-

ther recognize the Union nor apply Brush's collective bargaining agreement to Diversified's employees. Mark similarly maintained that he would not pay severance benefits, which the collective bargaining agreement promised to employees terminated in the event the company moved.[1] Borgos, on the other hand, contended that Brush was moving, that the Union contract would therefore apply to the new location and that any displaced employees would be entitled to severance benefits according to the contract.

Diversified began operating in May 1995, about two months after Brush closed. Although there was evidence that Mark Krantz intended eventually to expand and change the business, Diversified started out doing essentially what Brush had done before, albeit in a new location. Three Brush employees were hired by Diversified including Anna Goodwin, who had served as union shop steward at Brush.

Based on charges filed by the Union in early 1995, the Board issued a complaint in May 1995, amended in December 1995, against Brush and Diversified. The complaint alleged that Brush had attempted to evade its responsibilities under its collective bargaining agreement with the Union by conducting its operations through its "alter ego" Diversified, and that it had failed to pay required severance benefits. The Administrative Law Judge held an evidentiary hearing and in August 1996 found that Diversified was the alter ego of Brush. The Board affirmed that determination.

## II. Discussion

### A. Standard of Review

■ Whether Diversified is the alter ego of Brush is a question of fact. *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 455–56, 86 L.Ed. 718 (1942);

*Goodman Piping Products, Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir.1984) (per curiam). The Board's factual findings will be upheld if supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). Substantial evidence

> is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*Id.* at 477, 71 S.Ct. at 459 (internal citations omitted).

■ A number of different factors are relevant to the determination of alter ego status, including whether the two entities have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership, and whether the decision to change companies was motivated by anti-union sentiment. *Goodman*, 741 F.2d at 11; *NLRB v. Amateyus, Ltd.*, 817 F.2d 996, 998 (2d Cir.1987) (per curiam). No single factor, either by its presence or absence, is dispositive. See e.g., *NLRB v. Omnitest Inspection Services, Inc.*, 937 F.2d 112, 118 (3rd Cir.1991). Rather, the Board must "weigh the circumstances of the individual case...." *Goodman*, 741 F.2d at 11.

### B. Alter ego

■ The Board cites considerable evidence to support its alter ego finding. For example, there is clear evidence of common control. From at least 1993, Mark Krantz ran the daily operations of Brush. He negotiated with customers and suppliers and handled collective bargaining and other employ-

---

1. The severance provision, as it appears in the 1989 collective bargaining agreement, provides as follows:

It is agreed that in the event the Company *Moves* its Manufacturing operations from its present location, 2417 3rd Avenue, Bronx, New York, to any area outside the New York City limits, then the Company shall grant a Severance Pay Benefit which shall be equal to one week's average wages per year, for each year of service rendered.

The above Severance pay Benefit shall apply to all Union members who have been employed by the Company for a period of five (5) years or more and whose employment with the company is terminated only because of the above stated reason.

(emphasis supplied).

ment decisions for the company. Mark is now in control of Diversified, as president and 100% shareholder. See *Amateyus,* 817 F.2d at 998–99 (company owned by one brother was alter ego of company owned by other brother, because companies were similar and one brother dominated both companies). Diversified argues that Mark's mother Gertrude was involved in major decisions at Brush, but this is just as consistent with her position as sole shareholder as with Diversified's claim that she helped manage Brush.

The Board also points to evidence that transactions between Brush and Diversified were not arms-length, especially Gertrude's assistance in obtaining financing for Realty's purchase of the building in the new location by guaranteeing the loan, pledging her Brush stock as security, and subordinating her debt from Diversified. Citing the Board's decision in *Shellmaker, Inc.,* 265 NLRB 749, 1982 WL 24061 (1982), Diversified argues that evidence of Gertrude's pledge of stock and guarantee of the loan to Realty cannot be used against Diversified because Realty was not charged by the Board as an alter ego of Brush. We do not read *Shellmaker* this way. In any event, Gertrude's assistance of Realty is evidence of her continued financial interest in the success of her son Mark's new businesses, and was merely one factor among many considered by the Board.

In addition, there is substantial evidence that Diversified and Brush used similar equipment and supplies (particularly since Diversified purchased most of Brush's assets), and that their business purpose and operation were similar. Although Mark Krantz testified that he intends to expand the business, so far Diversified primarily makes paint brushes. Former Brush employee Goodwin testified that she still makes brushes in the same manner as when she was employed by Brush. There is also evidence that Brush and Diversified shared the same major customer.

Diversified advances a number of arguments against the Board's findings and conclusions. However, they do not persuade us that the Board's alter ego finding was not supported by substantial evidence.

Diversified first points to the Board's finding that Diversified was not created "to evade its responsibilities under the Act," and argues that this, plus the fact that the 100% owner of Brush (Gertrude) owned no stock in Diversified, "precludes, as a matter of law, a finding of alter ego liability." This argument is without merit.

■ Although "anti-union animus may be 'germane,'" it is not necessary for a finding of alter ego status. *Goodman,* 741 F.2d at 12. In any event, while the Board did not find that avoiding a union was the purpose of Diversified's creation, it did find "that its establishment was affected by, and was coexistent with, a desire to maintain a nonunion operation." 323 NLRB No. 44, p. 7. As for common ownership, the Board acknowledged that Brush and Diversified were separately owned but pointed out that, according to Board precedent, ownership by members of the same family can constitute substantially identical ownership. *Id.* at p. 6. This is particularly plausible here, where Gertrude Krantz retained an interest in the success of Diversified due to her pledge of stock and guarantee of the loan to Realty. Alter ego status is not precluded as a matter of law.

Diversified next argues that the Board misapplied the alter ego test, and that a proper weighing of the relevant factors would result in a finding that Diversified and Brush were not alter egos. We disagree. Because we need only determine if the Board's conclusions were supported by substantial evidence, we need not address Diversified's particular factual claims in much detail.

■ Diversified argues that the Board noted two distinctions between this and the typical alter ego case, but then failed to analyze these distinctions. Specifically, the Board found that Diversified operated in a different location from Brush, and that there was a two-month hiatus between Brush's closing and Diversified's opening. Diversified argues that these differences, coupled with the other favorable factual findings made by the Board, show that Diversified was not the alter ego of Brush. Even if we agreed with Diversified's assessment, it is not our job to re-weigh the factors used by

the Board. See e.g., *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464–65 (court may not displace Board's choice between fairly conflicting views, even if court would have made a different choice de novo). The existence of this evidence favorable to Diversified does not preclude the conclusion that there was also substantial evidence in the record to support the Board's alter ego finding.

Diversified also attacks some of the Board's subsidiary findings, either as improper interpretations of the evidence, or as unsupported by substantial evidence. Particularly, Diversified argues that the Board erred in relying on the testimony of Goodwin for evidence that Brush and Diversified shared the same major customer and operated in essentially the same manner, pointing out that Goodwin was strictly a brush maker and unqualified to speak on such matters. Diversified further disputes the Board's conclusions with respect to business purpose, equipment, management, ownership and whether the dealings between Brush and Diversified were arms-length, citing evidence and alternate interpretations. Again, we need not decide whether we would have found in the first instance, as the Board did, that Diversified and Brush were alter egos; we decide merely whether the Board's determination that they were is supported by substantial evidence. Granting Diversified's point that there are alternate explanations of the evidence, we nevertheless think the evidence described above to support the Board's alter ego finding was substantial, and that this finding must therefore be affirmed.

C. Severance

■ Diversified argues that even if it is found to be the alter ego of Brush, severance is only due to union members with 10 years employment at the company, rather than the five years specified in the agreement. See note 1, supra, and accompanying text. Diversified asserts that prior to 1982 the severance benefit vested only after 10 years, and

that Goodwin testified that the reduction to five years had not been bargained for. The Board found that because Brush had signed the 1982 agreement and all subsequent agreements incorporating the five-year provision, it was appropriate to hold them to the agreement as written. 323 NLRB No. 44, p. 1 n. 1. We agree.

D. Union recognition [2]

■ Diversified also objects to those portions of the Board's order compelling it to recognize the Union. Diversified argues, citing *Cooper Thermometer Co. v. NLRB*, 376 F.2d 684 (2d Cir.1967), and *NLRB v. Rapid Bindery*, 293 F.2d 170 (2d Cir.1961), that there should be no presumption that the Union represents Diversified's employees because only a minority of Brush's employees were hired by Diversified and they constitute a minority of Diversified's work force. Although the Board made no specific findings as to the number of people employed by Brush or Diversified, it seems clear that the three Brush workers hired by Diversified did not constitute a majority at either location. Further, Diversified asserts that on two occasions its employees have signed petitions stating that they do not wish to be represented by the Union. At oral argument the Board argued in response that when there is a collective bargaining agreement between the employer and the union, the contract-bar doctrine prevents any change in union status until the expiration of the agreement (but no longer than three years).

The Board argues that if we affirm its finding that Diversified is the alter ego of Brush, the contract-bar doctrine requires Diversified at the Union's request to recognize and bargain with it as representative of the employees at the new plant. However, it is not entirely clear when the last collective bargaining agreement signed by Brush is due to expire, or whether it has in fact already expired. It appears from the record

---

**2.** The Board asserts that Diversified failed to raise the issue of continued union representation before the Board and that, consequently, it is not properly before the court. See 29 U.S.C. § 160(e). However, in a September 1997 motion Diversified requested, and was granted by this court, permission to raise the issue in this appeal, on the grounds that misconduct by Board counsel had prevented Diversified from raising it below. Accordingly, we will consider the argument to be properly before us.

(including the terms of the Board's order and the opinion of the Administrative Law Judge) that the most recent agreement expired December 31, 1995. However, at oral argument Board counsel asserted that "[t]he contract was at least good for another year at the time of the hearing," which occurred in March 1996. Moreover, we are concerned that Diversified's employees not have a union imposed on them that they do not want. See *NLRB v. National Car Rental System, Inc.*, 672 F.2d 1182, 1191 (3d Cir.1982). We were also informed by Board counsel at oral argument that the incumbent union may have rights to address the employees and encourage them not to decertify.

We do not believe the Board's order to recognize and bargain with the Union is supportable on this record, nor do we think the Board adequately considered the wishes of Diversified's employees in reaching its decision. We therefore vacate so much of the Board's order as requires Diversified to recognize and bargain with the Union, and remand to the Board for further proceedings. See *Cooper*, 376 F.2d at 690. On remand, we expect that all parties who participated in the unfair labor practice proceeding will have an opportunity to supplement the record before the Board. If the last collective bargaining agreement has expired, we expect that the Board will determine through appropriate proceedings whether the employees in the new location wish to be represented by the Union.

Order enforced in part. Case remanded to the Board for further proceedings.