MILNE EMPLOYEES ASSOCIATION, a non-profit Mutual Benefit Corporation, or in the alternative Steven Bishop, Charles E. Tharp, Debra Bishop and Ella Tharp, as representatives of the class of affected former employees of Milne Truck Lines, Inc., and their spouses, Plaintiff–Appellant,

v.

SUN CARRIERS, INC.; Albert L. Labinger; Donald E. Mayoras; Milne Truck Lines; Elliott Burnside; Charles N. Pass; Thomas Morton; James Bradford; St. Johnsbury Trucking; Jones Truck Lines; Riordan Freeman & Spogli; Richard J. Riordan; Bradford M. Freeman; Ronald P. Spogli, Defendants–Appellees.

No. 89–15837.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1990.

Decided Nov. 20, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc May 4, 1992.

Richard E. Schwartz, James E. Parrot, Richard Schwartz & Associates, Ltd., St. Louis, Mo., for plaintiff-appellant.

Charles G. Bakaly, Jr., O'Melveny & Myers, New York City, for defendants-appellees.

Before: GOODWIN, SKOPIL, and BOOCHEVER, Circuit Judges.

## OPINION

BOOCHEVER, Circuit Judge:

Milne Employees Association ("MEA" or "employees") appeals from the district court's summary judgment in favor of Sun Carriers, Inc., Milne Truck Lines, and other defendants. 714 F.Supp. 1028. The district court concluded that MEA's various state law claims were preempted by section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) (1988) ("section 301"), and consequently were barred by the applicable six-month statute of limitations period.

The primary issue in this appeal is whether these state law claims are preempted by section 301. We reverse and remand the dismissal of MEA's claims for fraud, negligent misrepresentation of facts, suppression of facts, and intentional infliction of emotional distress, insofar as the emotional distress claim arises from defen-

dants' allegedly fraudulent conduct. We affirm the dismissal of MEA's claims for breach of the implied covenant of good faith and fair dealing, interference with contractual relations, and interference with prospective economic advantage. We also affirm the dismissal of defendants' motion for summary judgment as it relates to *Garmon* preemption.

## FACTUAL BACKGROUND

Plaintiff Milne Employees Association is an entity consisting of 566 former employees of defendant Milne Truck Lines, Inc. ("Milne") and their spouses.[1] More than 80 percent of Milne's employees were represented by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers ("Teamsters"), and the terms of their employment were governed by two collective bargaining agreements.[2] From approximately 1930 to 1980, Milne operated as an independent trucking company. In 1980, defendant Sun Carriers, Inc. acquired Milne. On September 29, 1986, Sun officers and defendants Riordan, Freeman, and Spogli purchased all of Sun's stock in a leveraged buy-out. At some point between that date and January 1987, MEA claims that all the defendants (collectively "Employer") secretly planned to liquidate Milne's assets to pay the leveraged buy-out debt. After January 1987, although Milne allegedly was reducing its sales and marketing forces, Milne management visited with employees at various Milne terminals in an effort to address industrywide rumors of the company's imminent closing. During these meetings, management allegedly made speeches and presented videotapes promising the employees job security, asking them to have faith in the group controlling defendant Sun, and asking them to refrain from seeking other employment. In August 1987, Employer sold two Milne terminals but represented the sales to employees as a "revamping" or as a "blend[ing]" of operations with other Milne terminals. MEA claims that all of these actions were "efforts to deceive, mislead and conceal" from Milne employees Employer's true intentions to liquidate the company.

On September 8, 1987, Milne requested numerous wage and benefit concessions from the Teamsters and stated that failure to agree to the concessions by September 11 would force Milne to shut down due to financial difficulties. On September 11, 1987, Employer closed all of Milne's 33 locations, liquidated its assets, and began terminating Milne employees.

One year later, MEA filed a complaint in California state court, bringing the following state tort and contract claims[3] based on Milne's alleged promises: fraud, negligent misrepresentation, suppression of facts, breach of the implied covenant of good faith and fair dealing, interference with contractual relations, interference with prospective economic advantage, and intentional infliction of emotional distress. Employer removed the case to federal court, and MEA moved to remand the case back to state court. On January 31, 1989, the district court held, 1) that the defendants other than Milne who were nonsignatories to the collective bargaining agreements, had standing to remove their cases to federal court on the basis of section 301 preemption, and 2) that all claims of the unionized former employees and their spouses were completely preempted by section 301 of the Labor Management Relations Act. On May 15, 1989, the district court finalized its order granting all defendants summary judgment as to all claims of the former unionized employees and their spouses, on the grounds that the claims were preempted by section 301 and

---

1. Originally, MEA was comprised of 614 former employees and 480 spouses but the claims of 48 managerial and nonunion employees were severed and remanded to state court.

2. In addition, 25 of Milne's employees were union mechanics represented by the International Association of Machinists ("IAM"), and

the terms of their employment were governed by a separate collective bargaining agreement.

3. On appeal, MEA has not briefed the issues of imposition of a constructive trust and loss of consortium, which were alleged as Claims VIII and IX in their original Complaint. Hence, we consider only Claims I–VII on this appeal.

barred by the applicable six-month statute of limitations. The district court also denied defendants' motion for summary judgment on the basis of *Garmon* preemption and remanded the nonunion employees' claims to state court. The former unionized employees now appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

■ The propriety of removal of a state action to federal court is a question of federal jurisdiction and is subject to *de novo* review. *Jackson v. Southern Cal. Gas Co.*, 881 F.2d 638, 641 (9th Cir.1989). We also review *de novo* both the district court's grant of defendants' summary judgment motion based on section 301 preemption and its denial of that portion of defendants' summary judgment motion relating to *Garmon* preemption. *Shane v. Greyhound Lines, Inc.*, 868 F.2d 1057, 1060 (9th Cir.1989).

## DISCUSSION

### I

#### *Removal Jurisdiction*

■ Title 28 U.S.C. § 1441(a) provides that a defendant may remove from state to federal court any civil action over which the district court would have had original jurisdiction. Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1988). Federal jurisdiction exists only if the federal question appears on the face of the plaintiff's "well-pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429–30, 96 L.Ed.2d 318 (1987); *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 112–13, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936). Thus, under the well-pleaded complaint rule, a defendant cannot remove a state law claim to federal court even if a defense, including the defense of preemption, is based on federal law. *Hunter v. United Van Lines*, 746 F.2d 635, 639 (9th Cir.1984), *cert. denied*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985).

■ The "complete preemption" doctrine, however, stands as an independent corollary or exception to the well-pleaded complaint rule. *Caterpillar*, 482 U.S. at 393, 107 S.Ct. at 2430. Under this doctrine, "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.* Plaintiffs cannot avoid removal by "artfully pleading" only state law claims that are actually preempted by federal statutes such as section 301 of the Labor Management Relations Act. *See Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 997 (9th Cir.1987). Thus, if a state law claim is completely preempted by a federal statute such as section 301, the state law cause of action necessarily becomes a federal one and can be removed.

■ MEA asserts that all of the named defendants except Milne were nonsignatories to the collective bargaining agreements ("CBAs") and therefore did not have standing under section 301 to remove the case from state to federal court. We disagree.

MEA relies primarily on *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819 (9th Cir.1985). There, the issue was whether a nonsignatory had standing to bring a hybrid suit for breach of a collective bargaining agreement and breach of the duty of fair representation. *Id.* at 820. Because the plaintiff was neither a member of the bargaining unit nor a third party beneficiary of the agreement, we concluded that he lacked standing to enforce a provision in the agreement. MEA asserts that *Karo* necessarily leads to the conclusion that, first, a nonparty to a CBA whose duties are not defined in the contract cannot be sued for breach of the contract and, second, a party who cannot be sued for breach of a CBA cannot raise a federal labor contract defense to a state tort claim.

*Karo*, however, did not present an issue of preemption, because that case involved a section 301 suit brought in federal court. The primary issue was merely whether

Karo had rights under the CBA and, thus, had standing to sue for its breach. Assuming that Karo had brought suit in state court and that the question of his standing to enforce the CBA required interpretation of the CBA, his claim might well have been subject to preemption. Contrary to MEA's belief, then, our holding in *Karo* does not prevent a nonsignatory to an agreement from raising the issue of section 301 preemption to remove a case to federal court.

In resolving this issue, we find controlling our decision in *Painting & Decorating Contractors Ass'n v. Painters & Decorators Joint Comm.*, 707 F.2d 1067 (9th Cir. 1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984) (*Painters*). That case presented the related question of "whether a non-signatory to a collective bargaining agreement was a proper party to a suit brought under § 301(a)." *Id.* at 1068–69. Answering the question in the affirmative, we stated:

> Section 301(a) does not contain any requirement that the parties to an action brought thereunder must also be the parties to the alleged breached contract....
>
> ....
>
> All that is required for jurisdiction to be proper under § 301(a) is that the suit be based on an alleged breach of contract between an employer and a labor organization and that the resolution of the lawsuit be focused upon and governed by the terms of the contract.

*Id.* at 1071 (citation omitted). In holding that a federal court may exercise jurisdiction over a state breach-of-contract claim against a nonsignatory in a section 301 action, *Painters* necessarily implied that a nonsignatory defendant in state court would have standing to remove the case to federal court under section 301. *Cf. Bloom v. Universal City Studios, Inc.*, 734 F.Supp. 1553, 1559 (C.D.Cal.1990) (section 301 can preempt state law claim against defendants who did not sign CBA), *aff'd*,

933 F.2d 1013 (9th Cir.1991); *Brown v. Keystone Consol. Indus., Inc.*, 680 F.Supp. 1212, 1220–22 (N.D.Ill.1988) (same). If a nonsignatory is a proper party under section 301, it would be anomalous to bar that same party from raising section 301 preemption as a basis for removal.

Our conclusion is also consistent with the federal policy favoring the interpretation of collective bargaining agreements under a uniform body of federal labor law. *See Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 210–11, 105 S.Ct. 1904, 1910–11, 85 L.Ed.2d 206 (1985); *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103–04, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Assuming that a state law claim requires interpretation of the CBA and thus would be preempted under section 301, *see Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410 (1988), preventing nonsignatories from removing such claims, while allowing signatories to remove the same claims, raises the distinct possibility of state and federal courts interpreting the same CBA provisions in an inconsistent manner. Because *Painters* dictates that nonsignatories can be parties to a section 301 action when a section 301 action is artfully pleaded as a state law claim, we hold that a nonsignatory to a CBA has standing to remove a case on the basis of section 301 preemption if resolution of the state law claim requires interpretation of the collective bargaining agreement.

## II

### Section 301 Preemption of State Law Claims

■ MEA next contends that the employees' state law claims are not completely preempted by section 301 and, thus, that the district court improperly exercised jurisdiction over the suit. In enacting section 301 of the Labor Management Relations Act of 1947,[4] Congress intended to ensure

---

4. Section 301(a) states:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought

in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
29 U.S.C. § 185(a) (1988).

that collective bargaining agreements are interpreted uniformly. *Lingle*, 486 U.S. at 404 & n. 3, 108 S.Ct. at 1880 n. 3 (quoting *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962)); *Allis–Chalmers*, 471 U.S. at 209–10, 105 S.Ct. at 1910–11 (same). To determine whether a state law claim is completely preempted under section 301, the relevant inquiry is whether resolution of the claim requires the interpretation of a collective bargaining agreement. *Lingle*, 486 U.S. at 413, 108 S.Ct. at 1885; *see also Ackerman v. Western Elec. Co., Inc.*, 860 F.2d 1514, 1517 (9th Cir.1988) (state law claim is not preempted if "the state law factual inquiry [does] not turn on the meaning of any provision of the collective bargaining agreement"). Such an analysis furthers the purpose of section 301 preemption doctrine "that federal law will be the basis for interpreting collective-bargaining agreements," while leaving undisturbed "the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements." *Lingle*, 486 U.S. at 409, 108 S.Ct. at 1883.

## A. *Fraud and Misrepresentation Claims*

 We therefore turn to MEA's claims to determine whether their resolution requires interpretation of the collective bargaining agreements. *Lingle* dictates that we begin by setting forth the elements of each state law claim. *Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882.

 MEA alleges three fraud-related claims: intentional misrepresentation of facts, negligent misrepresentation of facts, and suppression of facts. The claims are based in part on California statutes, *see* Cal.Civ.Code §§ 1709–1710, 1711 (West 1985), and reflect California's legislative declaration that "[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights." Cal.Civ. Code § 1708 (West 1985). With exceptions noted below, the common elements of these fraud claims are: (1) a misrepresentation, such as a false representation or a conceal-

ment of fact; (2) knowledge of falsity or concealment; (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage. *See Cicone v. URS Corp.*, 183 Cal.App.3d 194, 200, 227 Cal. Rptr. 887, 890 (1986). The negligent misrepresentation claim does not require intent; that is, the defendant may be liable even if he honestly believed the false statements to be true, so long as no reasonable grounds existed for such a belief. *Id.* at 208, 227 Cal.Rptr. 887 (quoting *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal.App.3d 104, 111, 128 Cal.Rptr. 901, 906 (1976)). Further, the suppression of facts claim generally requires a duty to disclose the concealed fact. *La Jolla Village Homeowners' Ass'n, Inc. v. Superior Court*, 212 Cal.App.3d 1131, 1151–52, 261 Cal.Rptr. 146, 158–59 (1989).

Resolution of the first three elements—misrepresentation, knowledge of falsity, and intent to defraud—does not require interpretation of the employees' collective bargaining agreements. Instead, it turns on Milne's state of mind and involves "purely factual questions pertain[ing] to ... the conduct and motivation of the employer." *Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882.

The fourth element, justifiable reliance, requires a two-part analysis. Initially, reliance must be established. The employees must show that they acted upon Milne's representations by, for example, buying homes and cars, sending children to college, and refraining from looking for other jobs. This, too, is a "purely factual inquiry pertain[ing] to the conduct of the employee[s]." *Id.* Then, the reliance must be shown to have been justified. The employees must show that the "circumstances were such to make it *reasonable* for plaintiff to accept defendant's statements without an independent inquiry or investigation." *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal.App.3d 1324, 1332, 231 Cal.Rptr. 355, 358 (1986) (citing 4 B.E. Witkin, Summary of Cal. Law § 475 (8th ed. 1974)). Because the employees knew at the

time of the alleged fraud that their employment with Milne was governed by collective bargaining agreements, they must prove that their reliance was justified in light of the agreements.

Defendants contend that such a showing requires interpretation of the collective bargaining agreements, thus triggering preemption under section 301. For example, one CBA provision renders null and void any agreement between the employer and employees which "in any way conflicts" with the terms of the collective bargaining agreement.[5] An examination of the collective bargaining agreements, however, reveals no provision or term which arguably conflicts with Milne's promises regarding its continued operations and employee job security, that would call for interpretation to determine whether a conflict actually exists. No provision in the agreement prohibits Milne from promising employees that the company will remain open or that their jobs will continue. Conversely, none of the provisions requires nor regulates promises of continued company operation. Therefore, contrary to Milne's belief, there is no need to construe or apply the provision prohibiting agreements that conflict with the collective bargaining agreement.

The defendants also argue that provisions addressing the procedures to be followed in the event of layoffs, plant closings, and changes of operations, require interpretation because MEA alleges that Milne made misrepresentations regarding employee job security.[6] Defendants, however, fail to explain why these provisions require interpretation when MEA's claims arise from alleged promises that the company would not close, and not from promises regarding rights or procedures entitled to them if the company closed. Although a court resolving MEA's fraud claims certainly will be required to interpret or analyze the alleged extracontractual promises, it would have no occasion to interpret the collective bargaining agreement itself, in part because these fraud claims do not originate in or refer to rights and duties derived from the collective bargaining agreement.

Evaluation of the fifth element of the three fraud claims—damages—does not require interpretation of the collective bargaining agreements either. MEA must merely prove facts about the type and degree of damage the employees have suffered from the alleged fraud. And finally, the additional element of the suppression cause of action, a duty to disclose, does not require such interpretation. The duty to disclose does not stem from the collective bargaining agreement; instead, it arises out of state law obligations imposed on a party in a fiduciary relationship, a party actively concealing undisclosed matters, or a party to a transaction who is privy to material facts inaccessible to the plaintiff. *Goodman v. Kennedy,* 18 Cal.3d 335, 346–47, 556 P.2d 737, 745, 134 Cal.Rptr. 375, 383 (1976). In sum, none of the elements of the fraud, misrepresentation, or suppression claims requires interpretation of the collective bargaining agreements.

■ We note that although we have examined the collective bargaining agreements to determine whether the employees' claims are preempted, we were not required to interpret them. The term "interpretation" is defined narrowly in this context. To determine whether federal jurisdiction is properly exercised over a state law claim brought by unionized employees, a federal court necessarily examines the collective bargaining agreement to determine whether the state law claims are "art-

---

**5.** The provision specifically states:

The Employer agrees not to enter into any agreement or contract with his employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

National Master Freight Agreement, art. 6, § 2.

**6.** For example, one such provision states:

When a terminal(s) is closed and the work of such terminal(s) is eliminated, an employee who was formerly employed at another terminal shall have the right to return to such former terminal and exercise his continuous classification [and] seniority, provided, he has not been away from such former terminal for more than a three (3) year period.

National Master Freight Agreement, art. 8, § 6, at 39.

fully pleaded" claims which actually allege breach of contract or require interpretation of the collective bargaining agreement's terms. Nonetheless, such an examination is not interpretation. If it were, the section 301 preemption doctrine would swallow the rule that employees covered by collective bargaining agreements are entitled "to assert legal rights *independent* of that agreement, including state-law contract rights, so long as the contract relied upon is *not* a collective-bargaining agreement." *Caterpillar*, 482 U.S. at 396, 107 S.Ct. at 2431. *Cf. Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911 ("not every dispute ... tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301....").

Finally, Milne and the other defendants urge us to apply cases which have required plaintiffs alleging fraud and misrepresentation claims "to show that the terms of the collective bargaining agreement differed significantly from the individual employment contracts they believed they had made." *Bale v. General Tel. Co. of Cal.*, 795 F.2d 775, 780 (9th Cir.1986); *accord Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 1001 (9th Cir.1987). Resolution of MEA's state tort claims, defendants argue, "is therefore 'substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract.'" *Bale*, 795 F.2d at 780 (quoting *Allis–Chalmers*, 471 U.S. at 220, 105 S.Ct. at 1916); *accord Stallcop v. Kaiser Found. Hosps.*, 820 F.2d 1044, 1049 (9th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987). A critical distinction, however, exists between these cases and the case before us. The majority of cases involving fraud claims brought by unionized employees present facts requiring interpretation of a specific provision or term of a collective bargaining agreement to resolve the state law claims. *See, e.g., Young*, 830 F.2d at 996 (alleged fraudulent misrepresentation regarding terminations conflicted with provision governing probationary employees); *Stallcop*, 820 F.2d at 1047, 1049 & n. 3 (alleged fraudulent misrepresentation regarding work responsibilities made in connection with a written rein-

statement agreement depended upon interpretation of a collective bargaining agreement); *Bale*, 795 F.2d at 777, 779–80 (resolution of fraud claims required interpretation of collective bargaining agreement definitions of "temporary" and "regular" employees). In each of these cases, the allegedly breached oral agreement represented a departure from the terms of the collective bargaining agreement; therein lay the alleged misrepresentation. In contrast, MEA asserts here that the alleged promise not to shut down the company differed from the defendants' secret plans to the contrary. As a result, resolution of these fraud claims does not require interpretation of specific terms or provisions in the collective bargaining agreement; indeed, the defendants' conduct in promising continued company operations and job security in the face of ill financial health was not addressed or foreseen in the collective bargaining agreement. Given the unique facts alleged in this case, then, both our conclusions here and in the *Bale* line of cases remain consistent with the analysis dictated by *Lingle*. *See generally Allis–Chalmers*, 471 U.S. at 220, 105 S.Ct. at 1916 ("The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis."). Accordingly, we find that the fraud claims are not preempted and that, therefore, the district court improperly exercised jurisdiction over these claims.

### B. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Next, the employees allege that the defendants breached the implied covenant of good faith and fair dealing arising under common law. *See Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 765 P.2d 373, 254 Cal.Rptr. 211 (1988); *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 453, 168 Cal.Rptr. 722, 727–28 (1980). They claim that, implied in their employer-employee relationship with Milne, there was a covenant of good faith and fair dealing under which Milne and the other defendants would do nothing to prevent or hinder the employees' ability to enjoy their

employment and accompanying financial benefits. Thus, in making the alleged false representations and closing Milne, the employees argue, the defendants breached this covenant of good faith.

■ Under California law, a claim for breach of this implied covenant is necessarily based on the existence of an underlying contractual relationship, and the essence of the covenant is that neither party to the contract will do anything which would deprive the other of the benefits of the contract. *Seaman's Direct Buying Service, Inc. v. Standard Oil Co. of Cal.*, 36 Cal.3d 752, 768, 686 P.2d 1158, 1166, 206 Cal.Rptr. 354, 362 (1984). This cause of action developed in the employment context to protect the job security of at-will employees who could be fired without cause under common law. No comparable lack of job security, however, generally exists for unionized employees, whose employment relationship is governed by a collective bargaining agreement. *Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142, 1147 (9th Cir.1988) (citing *Garibaldi v. Lucky Food Stores, Inc.*, 726 F.2d 1367, 1373 n. 9, 1374–75 n. 11 (9th Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1985)). Therefore, we have generally held that section 301 preempts the California state cause of action for breach of the implied covenant of good faith and fair dealing when an employee enjoys comparable job security under a collective bargaining agreement. *See, e.g., Cook v. Lindsay Olive Growers*, 911 F.2d 233, 238–39 (9th Cir.1990); *Chmiel v. Beverly Wilshire Hotel Co.*, 873 F.2d 1283, 1286 (9th Cir.1989); *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 999 (9th Cir.1987).

Here, MEA concedes that the underlying contracts, with respect to the unionized employees, are the collective bargaining agreements. In order to resolve whether the defendants' conduct has deprived the employees of their rights under the employment contract, a court would be required to interpret the collective bargaining agreement to determine the scope of those rights. Thus, we find that MEA's claim for breach of the implied covenant of good faith and fair dealing is preempted and that the cause of action was properly removed to the district court. We affirm the district court's holding that this claim was time-barred due to the expiration of the six-month statute of limitations for section 301 claims. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 155, 103 S.Ct. 2281, 2285–86, 76 L.Ed.2d 476 (1983).

C. *Interference with Contractual Relations and Prospective Economic Advantage*

■ MEA also alleges the claims of interference with contractual relations against all defendants other than Milne, and interference with prospective economic advantage against all defendants. Specifically, the employees allege that the interference and intrusion of the non-Milne defendants led Milne to terminate the employees and deprived them of opportunities to earn a living and to seek alternative employment earlier. As to the claim of interference with prospective advantage, MEA contends that the employees had the prospective advantages of continued earnings in the future and the ability to seek similar employment at other trucking industry jobs, and that the defendants interfered with these prospective advantages when they closed down Milne without notice, terminated the employees, and forced the employees to look for other jobs.

■ The essential elements of a claim for interference with contractual relations are: "1) a valid contract between plaintiff and a third party; 2) defendant's knowledge of this contract; 3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; 4) actual breach or disruption of the contractual relationship; and 5) resulting damage." *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 791 P.2d 587, 589–90, 270 Cal.Rptr. 1, 3–4 (1990). The tort of interference with prospective economic advantage does not require proof of a legally binding contract, but does require: 1) an economic relationship between plaintiff and a third party, with the probability of future economic

benefit to the plaintiff, 2) defendant's knowledge of the relationship, 3) intentional acts by the defendant designed to disrupt the relationship, 4) actual disruption of the relationship, and 5) proximately caused economic harm to the plaintiff. *Id.* at 1126 & n. 2, 791 P.2d 587, 270 Cal.Rptr. 1 (quoting *Youst v. Longo,* 43 Cal.3d 64, 71 n. 6, 729 P.2d 728, 233 Cal.Rptr. 294 (1987)).

Resolution of these claims will require interpretation of provisions in the collective bargaining agreements. As defendants point out, a court could not determine whether they induced a breach of the employees' contracts with Milne without construing the terms of the underlying contracts. Because the collective bargaining agreements address what types of disruptions of the contractual or economic relationship between Milne and the employees are allowed, *see, e.g.,* Nat'l Master Freight Agreement, art. 8, sec. 6 (change of operations); *id.* art. 23 (separation of employment), section 301 preempts the claims of interference with contractual relations and interference with prospective advantage. *Cf. California Elec. Co. v. Briley,* 939 F.2d 790, 793 (9th Cir.1991) (holding that § 301 preempts employer's claims against employees for interference with economic and contractual relationships because employees' duties to employer were defined by CBA).

We do not find *Dougherty v. Parsec, Inc.,* 872 F.2d 766 (6th Cir.1989), which MEA cites, instructive here. In *Dougherty,* a union employee's claim of tortious interference with contract arose from an alleged request by a client of the employer that the employee be terminated in retaliation for filing a safety violation complaint against the client. *Id.* at 767. In holding that the claim of tortious interference with contract was not preempted by section 301, however, the Sixth Circuit relied heavily on its interpretation of Ohio tort law. *Id.* at 770. Furthermore, unlike the Sixth Circuit, this court has generally found claims for interference with contractual relations and prospective economic advantage preempted by section 301. *See, e.g., California Electric,* 939 F.2d at 793; *Scott v. Machinists Automotive Trades Dist. Lodge No. 190,*

827 F.2d 589, 591–92 (9th Cir.1987); *Evangelista v. Inlandboatmen's Union of the Pacific,* 777 F.2d 1390, 1400–01 (9th Cir. 1985). Accordingly, we find MEA's claims of interference with contractual relations and prospective economic advantage preempted by section 301 and affirm the district court's dismissal of these claims.

### D. *Intentional Infliction of Emotional Distress*

■ Finally, MEA alleges that the conduct of Milne and the other defendants caused the employees severe emotional distress. Under California law, a plaintiff must prove the following elements to establish intentional infliction of emotional distress: 1) outrageous conduct by the defendant, 2) intentional conduct or reckless disregard of the probability of causing emotional distress, 3) the plaintiff's suffering severe or extreme emotional distress, and 4) causation of the emotional distress by the outrageous conduct. *Galvez v. Kuhn,* 933 F.2d 773, 779 (9th Cir.1991) (quoting *Trerice v. Blue Cross of California,* 209 Cal.App.3d 878, 883, 257 Cal.Rptr. 338, 340 (1989)). "Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Newberry v. Pacific Racing Ass'n,* 854 F.2d 1142, 1150 (9th Cir.1988) (citing *Cervantez v. J.C. Penney Co.,* 24 Cal.3d 579, 593, 595 P.2d 975, 156 Cal.Rptr. 198 (1979)).

Claims for intentional infliction of emotional distress are frequently preempted by section 301. *See, e.g., Cook v. Lindsay Olive Growers,* 911 F.2d 233, 239–40 (9th Cir.1990); *Harris v. Alumax Mill Products, Inc.,* 897 F.2d 400, 403 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 102, 112 L.Ed.2d 73 (1990); *Hyles v. Mensing,* 849 F.2d 1213, 1216–17 (9th Cir.1988). Yet we have recognized that if a claim for intentional infliction of emotional distress arises from conduct not addressed by a collective bargaining agreement, such a claim may not necessarily be preempted. *See e.g., Galvez,* 933 F.2d at 779–80 (emotional distress claim arising from assault and battery by supervisor not preempted); *Tellez*

*v. Pacific Gas & Elec. Co.,* 817 F.2d 536, 539 (9th Cir.), *cert. denied,* 484 U.S. 908, 108 S.Ct. 251, 98 L.Ed.2d 209 (1987) (emotional distress claim arising from defamatory circulation of suspension letters not preempted). *See also Garibaldi v. Lucky Food Stores, Inc.,* 726 F.2d 1367, 1369 n. 4 (9th Cir.1984) (suggesting that an emotional distress claim arising out of a non-preempted claim does not provide a basis for federal jurisdiction), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1985).

■ In the instant case, MEA's complaint appears to allege emotional distress arising from two types of conduct: 1) defendants' conduct in "terminat[ing] the employment relationship between Milne and its employees, and forc[ing] Plaintiffs to look for other jobs while experiencing the economic pressure, psychological pains and loss of self-esteem of unemployed persons," and 2) defendants' alleged malicious conduct designed to "sap the will of and psychologically weaken and ... discourage Plaintiffs from pursuing their legal claims and remedies against Defendants." Insofar as MEA's emotional distress claim against the defendants arises from the employees' discharge or termination, resolution of the claim will require interpretation of the collective bargaining agreement. Because the CBAs address layoffs, their terms may be relevant to the issue of outrageous conduct by showing whether the type of termination involved here is permitted and, thus, is arguably reasonable. *See Galvez,* 933 F.2d at 779 (quoting *Miller v. AT & T Network Systems,* 850 F.2d 543, 550 (9th Cir.1988)).

■ Like the collective bargaining agreements at issue in *Tellez* and *Galvez,* however, no provision in the collective bargaining agreements before us defines standards for the second type of underlying conduct of which MEA complains: false representations to employees outside the collective bargaining process regarding continued company operations or liquidation of the company. *See Miller,* 850 F.2d at 550 n. 5 ("[I]f the particular CBA does not govern the offending behavior, as

in *Tellez,* then an emotional distress claim is not preempted."). Thus, to the extent that plaintiffs' emotional distress claim arises from defendants' alleged fraud and suppression of facts, no interpretation of the CBA or its terms will be necessary. *Cf. Perugini v. Safeway Stores, Inc.,* 935 F.2d 1083, 1088–89 (9th Cir.1991) (emotional distress claim preempted to the extent it arises from employer's refusal to assign requested work but not preempted to the extent it arises from harassment due to pregnancy). Accordingly, MEA's emotional distress claim, insofar as it is arises from defendants' alleged fraud, is not preempted by section 301.

### III

#### *Garmon Preemption*

Because four of MEA's seven state law claims are not preempted by section 301, we turn to the defendants' contention that these claims are nonetheless preempted under *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and its progeny.

■ According to *Garmon,* when an activity is arguably prohibited or protected by sections 7 or 8 of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.,* state and federal courts must defer to the exclusive jurisdiction of the National Labor Relations Board. *Id.* at 245, 79 S.Ct. at 779. Conduct, however, that is arguably prohibited or protected by the NLRA will not be preempted under *Garmon* if the alleged conduct is only of peripheral concern to the Act or implicates interests that are "deeply rooted in local feeling and responsibility." *Id.* at 243–44, 79 S.Ct. at 778–79 (citations omitted).

■ In *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the Supreme Court refined the *Garmon* analysis and held that if the alleged conduct is arguably prohibited, the critical inquiry is "whether the controversy presented to the state court is identical to ... or different from ... that which could have been, but was not, presented to the

Labor Board." *Id.* at 197, 98 S.Ct. at 1757 (finding no *Garmon* preemption of trespass action despite fact that union's picketing may have been arguably prohibited by the NLRA). It is only when the controversies are identical that "a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid." *Id.* at 197–98, 98 S.Ct. at 1757–58. The party claiming preemption bears the burden of demonstrating that the challenged activity is arguably prohibited by the NLRA. *International Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 395, 106 S.Ct. 1904, 1914–15, 90 L.Ed.2d 389 (1986).

## A. *Bad faith bargaining*

 Defendants contend that the alleged misrepresentations regarding Milne's continued operation and employees' job security are arguably prohibited by the NLRA as bad faith bargaining.

 An employer's decision to shut down part of its business for economic reasons is not a mandatory subject of bargaining under § 8(d) of the NLRA. *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 686, 101 S.Ct. 2573, 2584–85, 69 L.Ed.2d 318 (1981). An employer, however, must bargain in good faith about the effects of a plant closure "in a meaningful manner and at a meaningful time." *Id.* at 682, 101 S.Ct. at 2582. The determination of whether an employer has provided such meaningful and timely notice depends upon the facts of each case. *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 27 (1st Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). *Compare id.* (same day notice to unions of decision to terminate operations violated the duty to bargain over the effects of closure) *with Chippewa Motor Freight, Inc. & Action Carrier, Inc.*, 261 N.L.R.B. 455, 460 (1982) (rejecting argument that two days' notice prior to terminal closure was not "a meaningful time" for the purpose of providing the union an opportunity to bargain about the effects of closure).

Generally, the duty to bargain in good faith is a continuing one. Bargaining about a plant closure's effects, however, is only required at a meaningful time because the prerequisite decision to close implicates unique concerns for management:

> [M]anagement may have great need for speed, flexibility, and secrecy in meeting business opportunities and exigencies. It may face significant tax or securities consequences that hinge on confidentiality, the timing of a plant closing, or a reorganization of the corporate structure. The publicity incident to the normal process of bargaining may injure the possibility of a successful transition or increase the economic damage to the business. The employer also may have no feasible alternative to the closing, and even good-faith bargaining over it may both be futile and cause the employer additional loss.

*First Nat'l Maintenance Corp.*, 452 U.S. at 682–83, 101 S.Ct. at 2582–83.

Here, the defendants allegedly misrepresented their plans for Milne's closure. They allegedly contrived new sales and service programs in order to cover up their plan to liquidate Milne's assets. *See* Complaint, ¶ 18 and ¶ 19. Around June 1, 1987, they allegedly visited Milne terminals to "'put [ ] to rest any rumors' that Milne was to be closed," and promised job security to the plaintiffs. *Id.* at ¶ 17. Two months later, they announced Milne's progress in making its debt payments, without revealing the alleged plan to close Milne or the uncertain status of the employees' job security. *Id.* at ¶ 20. MEA maintains that the employees were ignorant of Milne's financial woes until Milne's letter of September 8, 1987 announced that Milne would close absent concessions from the union. *See id.* at ¶ 23.

 We agree with the district court that these facts do not require the dismissal of the state law fraud and emotional distress claims under the *Garmon* doctrine. Most of the alleged misrepresentations involved Milne's impending closure, regarding which defendants had no duty to bargain. *First Nat'l Maintenance Corp.*,

452 U.S. at 686, 101 S.Ct. at 2584–85. Representations regarding Milne's sales programs or debt payments are also managerial decisions which are not subject to mandatory bargaining. *See Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 223, 85 S.Ct. 398, 409–10, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring). "An employer's failure or refusal to bargain over a non-mandatory subject does not violate section 8(a)(5)." *Wells v. General Motors Corp.,* 881 F.2d 166, 170 (5th Cir.1989) (citing *NLRB v. Wooster Div. of Borg–Warner Corp.,* 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958)), *cert. denied,* 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990). Thus, to the extent that the plaintiffs' fraud and emotional distress claims are based upon such misrepresentations, they survive *Garmon* preemption.

Insofar as defendants also assured employees that their jobs would continue, several factors indicate that these statements also do not establish bad faith or fraudulent bargaining. First, these representations were an inevitable conclusion one could infer from the primary fraud alleged, namely, the deception of employees regarding Milne's continued operation. Thus, unlike an employer who falsely promises to relocate employees upon a plant's closure or who misrepresents the terms of severance pay, the instant facts appear to implicate management's prerogative to close rather than management's obligation to bargain about the effects of closure.

Second, given that the misrepresentations to individual employees regarding job security were made weeks and months prior to closure, defendants have not demonstrated that the Board would find that this arguably constituted a failure to engage in effects bargaining with the union at a meaningful time. *Cf. Creasey Co., Inc.,* 268 N.L.R.B. 1425, 1426 (1984) (four days notice to union of division closure was reasonable and did not violate employer's duty to bargain about effects). This is especially so in light of the fact that Milne subsequently revealed to the unions its plans to close absent concessions and also offered to bargain about the effects of closure. Indeed, in dismissing the unfair labor practice charges filed against Milne, the Board itself implied that Milne's notice to the Teamster bargaining agent in late August 1987 of the possibility of closure and its offer to bargain about the effects of closure in September 1987 satisfied Milne's duty to bargain in good faith. *See* S.E.R., Exhibit E.

■ Third, we are further convinced that Milne's assurances of job security did not constitute bad faith or fraudulent bargaining, because the alleged misrepresentations did not arise during collective or informal bargaining. While an employer may not be required to bargain about the effects of closure until "a meaningful time" is reached, if it raises the topic during bargaining in order to secure concessions regarding the terms and conditions of employment, any representations would have to be made in good faith. *See Parker v. Connors Steel Co.,* 855 F.2d 1510, 1515–16 (11th Cir.1988) (employer's securing of massive wage and benefit concessions by falsely representing that such concessions would keep the plant open constituted a failure to bargain in good faith), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989). Hence, it is relevant, though not dispositive, whether misrepresentations to union members arise during or outside of the collective bargaining process. *Wells,* 881 F.2d at 171.

The *Wells* court, for example, concluded that a fraud claim based upon an employer's misrepresentations outside of the collective bargaining process was not barred by *Garmon* preemption. In so holding, that court observed why such fraud had little import on national labor policy:

[T]he challenged conduct here was not an attempt on the part of [the employer] to interfere with the collective bargaining process or to diminish the union's representative role; instead, it was a post-bargaining effort to induce individual employees to accept [voluntary termination] benefits. While not dispositive, it is relevant that the parties had completed collective bargaining over the [voluntary termination program]; GM's alleged in-

ducements had no direct bearing upon the collective bargaining process in that they were not offered in order to obtain ratification of an agreement.

881 F.2d at 171 (footnotes omitted). *Cf. Windfield v. Groen Div., Dover Corp.,* 890 F.2d 764, 769–70 (5th Cir.1989) (finding no *Garmon* preemption of fraud claim arising from employer's promise of job security to a union organizer employee).[7] Such reasoning applies with equal force here.

Here, MEA's complaint alleges that Milne officials made speeches or unilateral assurances promising that jobs would continue; nowhere does it assert that Milne lied during any kind of collective or informal bargaining for the purpose of inviting negotiations or obtaining concessions on the topic.[8] In contrast, cases finding a failure to bargain in good faith due to fraud regarding plant closures involve misrepresentations "concerning concessions sought, induced, or offered in order to avoid a plant closure."[9] *See, e.g., Parker,* 855 F.2d at 1515; *Kolentus v. Avco Corp.,* 798 F.2d 949, 960–62 (7th Cir.1986) (finding *Garmon* preemption where employer allegedly misrepresented and failed to disclose facts relevant to plant closing during negotiation of a CBA and pension agreement), *cert. denied,* 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987); *Serrano v. Jones &*

*Laughlin Steel Co.,* 790 F.2d 1279 (6th Cir.1986) (finding failure to bargain in good faith where employer obtained concession agreements by representing that plant would remain open and continued to exploit such negotiated concessions by fraud). Although the defendants' representations here may have been fraudulent, we are not persuaded that they constituted fraudulent or bad faith "bargaining." *Cf. Wells,* 881 F.2d at 171–72 (finding no *Garmon* preemption in part because employer's allegedly fraudulent representations were made independent of collective bargaining).[10]

Even if we accepted defendants' argument that its alleged misrepresentations or concealment is arguably prohibited by § 8, we note that MEA's state law claims would not present an "identical" controversy to the one which could have been presented to the Board. *Sears,* 436 U.S. at 197–98, 98 S.Ct. at 1757–58. In determining whether defendants had failed to bargain in good faith, the Board would have examined issues such as whether Milne had given the unions meaningful notice of its decision to close, *see Penntech Papers,* 706 F.2d at 26–27, whether Milne had engaged in surface bargaining in its offer to bargain with the unions, or whether special circumstances influenced the timing of Milne's notice to

---

7. *Contrast Wells,* 881 F.2d at 171–72 *and Windfield,* 890 F.2d at 769–70 *with Parker,* 855 F.2d at 1517–18 (finding *Garmon* preemption of fraud claims alleging that the employer obtained two concession agreements by fraudulently representing that it would keep its steel plants open).

8. Defendants state that MEA's complaint, ¶ 23, alleges that Milne lied during the 1987 negotiations with the Teamsters by representing that concessions could prevent plant closure. That paragraph does not mention "lies" but alleges that Milne's letter of September 8, 1987 announced that Milne's operations would close down barring substantial concessions from the unions. It further alleges that "[t]his was the first time that Defendants ever communicated to Plaintiffs anything concerning their long-standing secret plans for Defendant Milne. At no time prior to the publication of that letter . . . did any of Defendants . . . apprise any of Plaintiffs of even the possibility that Defendant Milne . . . might be closed." Complaint, ¶ 23.

We construe the allegations of ¶ 23 as pointing out that the September 8 letter revealed for the first time defendants' plans to close Milne.

Even assuming some ambiguity, we do not believe this contention by the defendants requires *Garmon* preemption of MEA's claims. *See Davis,* 476 U.S. at 395, 106 S.Ct. at 1914–15 (party claiming preemption must demonstrate that the challenged conduct is arguably prohibited by the NLRA).

9. *Machinists Automotive Trades Dist. Lodge v. Peterbilt Motors Co.,* 220 Cal.App.3d 1402, 1408, 269 Cal.Rptr. 911, 914 (1990) (describing *Parker, Serrano,* and *Kolentus* ).

10. Even in *Serrano,* upon which the defendants rely, "the gravamen of the three fraud charges [was] that [the employer] did not bargain in good faith in obtaining concessions . . . in the July agreement." 790 F.2d at 1286. To the extent that the employer's post-negotiation misrepresentations in *Serrano* can be construed as an independent basis for finding a failure to bargain in good faith, rather than as a continued exploitation of the fraudulently-bargained concessions, we decline to follow our sister circuit.

the unions. *See Yorke v. NLRB,* 709 F.2d 1138 (7th Cir.1983) (finding no breach of duty to bargain about effects despite trustee-in-bankruptcy's failure to provide preclosure notification due to emergency situation), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1276, 79 L.Ed.2d 680 (1984); *Penntech Papers,* 706 F.2d at 27. Resolution of the fraud and emotional distress claims, however, would focus upon different issues. The state court would inquire whether Milne made misrepresentations to the employees, whether the employees relied on such statements, whether the employees were damaged, and whether the employees suffered severe or extreme emotional distress from defendants' conduct. Hence, despite the commonality of some underlying facts, allowing the employees to pursue their state law claims will not interfere with the Board's determination of matters within its scope of expertise.

Moreover, it is well established that some disputes arguably subject to *Garmon* preemption can be resolved by state law if the alleged conduct implicates interests "deeply rooted in local feeling and responsibility." *Garmon,* 359 U.S. at 243–44, 79 S.Ct. at 779 (citations omitted). California has a "substantial interest in protecting its citizens from misrepresentations that have caused them grievous harm." *Belknap, Inc. v. Hale,* 463 U.S. 491, 511, 103 S.Ct. 3172, 3183, 77 L.Ed.2d 798 (1983). *See also Windfield,* 890 F.2d 764, 770 (5th Cir.1989) (agreeing with *Belknap* that federal labor law should not "create an exemption from state law liability for misrepresentations or promises that are not specifically privileged as a matter of federal policy.").

We conclude that Milne's alleged misrepresentations to its employees are not arguably prohibited by the NLRA as bad faith bargaining and do not provide a basis for *Garmon* preemption.

### B. *Direct Bargaining*

Defendants next claim that Milne's misrepresentations constituted direct bar-

gaining with employees, thereby providing another basis for *Garmon* preemption.

An employer who bargains directly with individual employees violates § 8(a)(5)'s requirement that an employer bargain collectively with the designated representative of its employees. *Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). In *Medo,* the Supreme Court found direct bargaining where the employer disregarded the employees' union by negotiating with individual employees after the employees offered to abandon the union for increased wages. As the Second Circuit explained, "[t]he vice that *Medo* sought to avoid was the practice of undermining the authority of the union's bargaining representatives through direct dealings with the locals or employees they represented. Such tactics are inherently divisive; they make negotiations difficult and uncertain; they subvert the cooperation necessary to sustain a responsible and meaningful union leadership." *NLRB v. General Electric Co.,* 418 F.2d 736, 755 (2d Cir.1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970).

Here, the facts fail to reveal that Milne and the employees engaged in the type of conduct which generally leads to a finding of direct bargaining: namely, bargaining or negotiating over the terms of employment in circumvention of the designated representative. *See, e.g., Medo,* 321 U.S. at 679, 64 S.Ct. at 831; *NLRB v. Babad,* 785 F.2d 46, 50 (2d Cir.) (bargaining and settling the conditions of discharge with individual employees rather than union), *cert. denied,* 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986); *General Electric Co.,* 418 F.2d at 755 (offering better terms to union locals while bargaining with the unions' national bargaining representative). Instead, the alleged misrepresentations about continued job security occurred while Milne management made speeches or gave assurances that Milne would not close. In any event, even assuming that the alleged misrepresentations arguably constituted direct bargaining, the claims

which would be presented to the state court and the direct bargaining charge which would be presented to the Board are not identical controversies.[11] *Sears,* 436 U.S. at 198, 98 S.Ct. at 1758. Accordingly, we affirm the district court's denial of defendant's motion for summary judgment on the basis of *Garmon* preemption.[12]

## CONCLUSION

We affirm the district court's holding that a nonsignatory to a collective bargaining agreement may remove a case to federal court on the basis of section 301 preemption. The district court properly exercised jurisdiction over MEA's claims for breach of the implied covenant of good faith and fair dealing, interference with contractual relations, and interference with prospective economic advantage, as they were completely preempted under section 301. Accordingly, we affirm the district court's dismissal of these claims as time-barred.

The remaining claims of fraud, misrepresentation, and suppression of facts are not preempted under section 301 because their resolution does not require interpretation of the collective bargaining agreements. The claim of intentional infliction of emotional distress, insofar as it arises from defendants' fraud-related conduct, is not preempted under section 301 for the same reason. Moreover, these four claims are not preempted under the *Garmon* doctrine. We therefore remand these claims to the district court, which shall determine whether to retain pendent jurisdiction over these remaining state law claims or to remand them to state court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

11. A direct bargaining or dealing charge would require the Board to examine whether the communications concerned terms and conditions of employment, whether the employer's communications to the employees were privileged under § 8(c) of the NLRA, and whether the proposals or communications tended to undermine or derogate the union's status as the exclusive bargaining representative. *See NLRB v. Pratt & Whitney Air Craft Div.,* 789 F.2d 121, 134–35 (2d Cir.1986). These issues are different from those that would be presented to a state court resolving the fraud and emotional distress claims. *See supra* p. 1417 of opinion.

12. In its petition for rehearing, defendants raise two arguments for the first time. They claim that *Garmon* preemption is required because their alleged misrepresentations constituted a direct promise of benefit in circumvention of the union or a unilateral change in the collective bargaining agreement. We have carefully considered these arguments and find them without merit.

